CHARLES P. WEBBER et al

*vs.*

BARKER LUMBER COMPANY AND HENRY BARKER.

Penobscot.    Opinion April 8, 1922.

*Acts of dominion relied upon in creating title by adverse possession are questions of
law.    Whether such acts were really done, and the circumstances under which
they were done, raise questions of fact.    Mental intent alone not sufficient to
create a possession which would ripen into adverse possession, but must
be based on the existence of physical facts which openly evince a
purpose to hold dominion over the land in hostility to the title
of the real owner, and such as will give notice of such
hostile intent.    Occasional trespasses in cutting
wood or timber not sufficient, nor attempts to
keep off trespassers.    Doctrine of equi-
table estoppel not sustained.*

The burden of proof is upon him who claims title by adverse possession.

If possession is claimed to be adverse the acts of the wrong-doer must be strictly
construed and the character of the possession clearly shown, since there is
every presumption that the occupancy is in subordination to the true title.

A substantial fence built around a parcel of land sought to be held by adverse
possession, and for the purpose of showing an adverse claim to the part enclosed,
may be an act of such notoriety as to afford notice to all concerned of the
builder's assertion of right; but when a brush fence is erected for the simple
convenience of the builder it can have no such significance.

The unrestricted meandering of cattle upon land of a neighbor is quite a different
proposition from that of a deliberate intent of the owner of the cattle to pasture
his stock upon his neighbor's land and by so doing, to claim the establishment
of a right which would ripen into a title to that land by adverse possession.
The test of the hostile or adverse character of possession is the intent of the
disseizor.

A secret, mental intent alone, however, would not be sufficient to create a posses-
sion which would ripen into adverse possession.    There must exist physical
facts which openly evince a purpose to hold dominion over the land in hostility
to the title of the real owner, and such as will give notice of such hostile intent.

The final clause of Sec. 10, Chap. 110, R. S., applies where disseizor occupies and
uses a wood-lot in connection with a farm which he is also occupying and using

adversely, but does not apply to a wood-lot thus occupied and used by disseizor who has title to a farm by him used and occupied, even though such wood-lot may lie contiguous to the farm.

The characteristic element of abandonment is the voluntary relinquishment of ownership, whereby the thing so dealt with ceases to be the property of any person and becomes the subject of appropriation by the first taker. At common law a perfect legal title to a corporeal hereditament cannot be lost by abandonment. Its very essence is inconsistent with the attributes of real estate.

Equitable estoppel concludes one from denying his own acts or admissions which were expressly designed to influence the conduct of another and did so influence it, and when such denial will operate to the injury of another. It must be shown that the party estopped had some knowledge of the rights, interests, or intentions of the other party, or his relations to the thing to which his declarations or acts related, or that he had some intention of misleading the other party into some action that might be prejudicial to him.

On motion for new trial, and exceptions by plaintiffs. This is an action in trover for certain trees cut and removed by defendants on the south half of lot number 9, range 10, in the town of Greenfield, in the fall and winter of 1916. The defendants pleaded the general issue and estoppel by way of brief statement. Plaintiffs relied upon record title, and defendants claimed title by adverse possession of their grantors and predecessors in title. The case was tried before a jury who returned a verdict for defendants. Plaintiffs filed a general motion for a new trial, and also took exceptions to admission of certain testimony, and to refusal of the presiding Justice to give requested instructions in the charge to the jury. Verdict set aside. New trial granted. Exceptions not considered.

The case is fully stated in the opinion.

*Ryder & Simpson*, for plaintiffs.

*William H. Powell and George H. Morse*, for defendants.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, DEASY, JJ.

PHILBROOK, J. This is an action in trover to recover the value of trees cut and removed by the defendants on and from land to which plaintiffs claim title. The defendants justified on the ground that their grantors of the stumpage had acquired title to the same land by adverse possession. The verdict was for the defendants

and the case is before us upon plaintiffs' motion for a new trial, based upon the customary grounds, also upon exceptions to admission of certain testimony, and refusal in the charge to the jury, to give instructions as requested by plaintiffs.

THE MOTION. The disputed tract of land is the south half of lot 9, range 10, in the town of Greenfield. According to field notes and plans introduced by the plaintiffs, this south half of lot 9, range 10, the north half of lot 9, range 10, and all of lot 10, range 10 was designated by Strong's survey, made in 1809, as lot 34. According to the same survey all of lot 9, range 10 was known as the west division of lot 34, and all of lot 10, range 10, was known as the east division of lot 34. These two divisions are of the same length running from north to south, but the east division, running from east to west, is broader than the west division. The two divisions make a rectangle which is bounded on the north by the Hallowell tract, on the east by lot 35, on the south by lots 46 and 45, and on the west by lot 33. Through a long line of conveyances, beginning with a grant from the Commonwealth of Massachusetts, the plaintiffs claim record title to this rectangular lot of land and we are of opinion that they have proved their record claim.

While the plaintiffs were thus substantiating their own record title they also introduced conveyances from the same original source showing that the south half of lot 33, lying next west of lot 34, in 1853 came by various deeds to George R. White who occupied said south half of lot 33, from the latter date until his death in 1885. He died intestate and the lot was then occupied by his widow and their son, G. H. White, who was generally known as Hollis White. In 1896 Hollis White, after his mother's death, obtained from the other heirs of his father a quit-claim deed of their interest in the said premises. Hollis White continued to occupy this half lot until his death on April 30, 1916. During this occupancy of the south half of lot 33 by George R. White, by his widow and Hollis, and lastly by Hollis, from 1853 to 1916, the defendants claim that by adverse possession the Whites also acquired title to the disputed tract, viz.: the south half of lot 9, range 10, which, as we have seen, is a rectangular piece of land carved out of the southwest corner of the larger rectangle known as lot 34 to which plaintiffs have record title.

About a year before his death Hollis sold the stumpage on the disputed tract to Henry L. Barker and John Costley, giving a

deed therefor, and later these grantees gave a verbal permit to the defendants to cut and remove this stumpage, which cutting and removal was done, resulting in the suit at bar.

The controversy between the parties, therefore, is whether the Whites did such acts upon the disputed tract, or otherwise exercised such occupancy and control thereover, as would give them a title by adverse possession which would outweigh the record title of the plaintiffs.

In the abstract what acts of dominion will result in creating title by adverse possession is a question of law. In this field the powers of the court are primary and plenary. Whether those acts were really done, and the circumstances under which they were done, raise questions of fact. In this field the powers of the jury, in the first instance, are primary and plenary. The results from the exercise of jury power should be reversed by the court only when the jury has plainly misunderstood the law applicable to the case, or when they have exercised their power in a manner which plainly shows that they have been moved upon by bias or prejudice.

The record, which includes a very large number of exhibits, is quite voluminous, and a complete analysis of the testimony would be of small interest to anyone except the parties. Only a portion of the charge to the jury is presented for our inspection. We must assume that the instructions of the presiding Justice which are not made the subject of exceptions, and hence not printed in the record, were correct statements of the law governing the case.

As usual, in cases of this kind, the parties differ not only as to the facts but also, if the facts are established, as to their effect upon the legal question of gaining title by adverse possession.

### 1. MAINTAINING FENCES.

The plaintiffs claim that to make out adverse possession by maintaining fences the defendants must show a substantial enclosure; that it is not enough to show a fence made merely by lopping one tree upon another; that the enclosure must be completed on all sides of the disputed territory; must be definitely located; and must be maintained continuously for the full statutory period. The plaintiffs claim that these requirements have not been established. On the other hand the defendants claim that the disputed tract was fenced on the south by a rail fence, nearly across the lot,

while on the north and east there was a brush fence with gate and bars on the east. Thus they claim that they have met the requirements regarding fencing. Upon that issue the burden is upon the one claiming by adverse possession, in this case the defendants. *Magoon* v. *Davis*, 84 Maine, 178; *Batchelder* v. *Robbins*, 95 Maine, 59; *Webber* v. *McAvoy*, 117 Maine, 326. Moreover, there is every presumption that the occupancy is in subordination to the true title, and if the possession is claimed to be adverse the acts of the wrong-doer must be strictly construed and the character of the possession clearly shown. *Preble* v. *M. C. R. R. Co.*, 85 Maine, 260; *Roberts* v. *Richards* 84 Maine, 1; *Codman* v. *Winslow*, 10 Mass., 146; *Ricard* v. *Williams*, 7 Wheat., 59; *Huntington* v. *Whaley*, 29 Conn., 391; *Coburn* v. *Hollis*, 3 Met., 125; *Jackson* v. *Sharp*, 9 Johns., 163. Examining the testimony in the light of these legal requirements, and giving it the effect most favorable to the defendants, we discover that there was a stone and rail fence on the westerly portion of the south line, but from the easterly end of this stone and rail fence there extended easterly only a brush or hedge fence, commonly known as a lop and top fence, and even that did not extend fully to the southeast corner of the tract; that there was at some time a similar lop and top fence on practically all of the east and north sides. One witness described it in these words "brush was piled up there like it would be for a brush fence," and that it was so piled "probably three feet or such matter." Other witnesses admitted on cross-examination that for quite a period of time even these lop and top fences had ceased to exist. It plainly appears that the hedge fences, whenever built or however long maintained, were simply convenient means of keeping Mr. White's cattle from escaping from territory which he was using as a pasture. There is no evidence of any fence, at any time, on the west line.

"A substantial fence built round a parcel of land sought to be held by adverse possession, and for the purpose of showing an adverse claim to the part enclosed, may be an act of such notoriety as to afford notice to all concerned of the builder's assertion of right; but when a brush fence is erected for the simple convenience of the builder it can have no such significance." *Roberts* v. *Richards*, 84 Maine, at Page 12, and numerous cases there cited. Upon this element of the case, namely, gaining adverse possession by maintain-

ing fence, we are of opinion that the defendants have failed to sustain the burden which the law imposes upon them.

## 2. . Pasturing Animals Upon the Disputed Tract.

In considering this element we must note the location of the disputed tract with reference to the south half of lot 33 which the Whites occupied, and of which they held a deed. The southwesterly portion of the south half of 33 was a field and used as such. A portion of the southeasterly parts consisted of and were used as a pasture. There does not appear to have been a fence between this pasture in 33 and the disputed tract lying next east of it. It does appear that the Whites turned their cattle into their own pasture, which covered a portion of the easterly side of lot 33, and since there was no fence to prevent they roamed over the disputed tract and were sometimes there found by the sound of the cow bell. This unrestricted meandering of cattle upon land of a neighbor is quite a different proposition from that of a deliberate intent of the owner of the cattle to pasture his stock upon his neighbor's land and by so doing to claim the establishment of a right which would ripen into a title to that land by adverse possession. The test of the hostile or adverse character of possession is the intent of the disseizor. *Preble* v. *M. C. R. R. Co.*, supra; *Martin* v. *M. C. R. R. Co.*, 83 Maine, 100; *Richardson* v. *Watts*, 94 Maine, 476; *Ricker* v. *Hibbard*, 73 Maine, 105; *Soper* v. *Lawrence*, 98 Maine, 268. *Phinney* v. *Gardner*, 121 Maine, 44, 115. Atlantic Reporter, 523.

We do not desire to be understood as saying that intent alone, a secret, mental intent, would be sufficient to create a possession which would ripen into adverse possession. In other words, constructive possession alone, will not avail. For adverse possession, to create title, does not consist alone of mental intentions but must also be based on the existence of physical facts which openly evince a purpose to hold dominion over the land in hostility to the title of the real owner, and such as will give notice of such hostile intent. *Tennis Coal Company* v. *Sackett*, 172 Ky., 729; 190 S. W., 130; Annotated cases, 1917 E., 629. In *Richmond Iron Works* v. *Wadhams*, 142 Mass., 569, we find a case very similar to the one at bar. Title by adverse possession was there claimed because the claimant's cattle, put upon his own land, had used that land, and

also adjacent land owned by one who had prior title, as a place upon which to run, feed and drink, without hindrance or objection made by anyone, for more than twenty years, but the Massachusetts court held that the claimant had not thus gained title to the adjacent land by adverse possession.

### 3. CUTTING WOOD AND TIMBER.

The defendants claim with much confidence that the Whites gained title by adverse possession because the latter had cut logs and firewood, and peeled bark, somewhere upon the disputed tract, which operations had been carried on with more or less regularity over a period of more than twenty years. But a careful examination of the testimony reveals such desultory and occasional acts, so far as log and bark operations are concerned, that they comport far more nearly with acts of mere trespass than of actual occupation and possession.

The occupation of woodland as a wood-lot, under certain circumstances and conditions, may work an adverse possession which will successfully bar the owner by a record title from recovering his land. R. S., Chap. 110, Sec. 10, reads as follows:

"To constitute a disseizin, or such exclusive and adverse possession of lands as to bar or limit the right of the true owner thereof to recover them, such lands need not be surrounded with fences or rendered inaccessible by water; but is sufficient if the possession, occupation and improvement are open, notorious and comporting with the ordinary management of a farm; although that part of the same which comprises the woodland belonging to such farm, and used therewith as a woodlot, is not so enclosed."

But the Whites held lot 33 by deed, not by adverse possession. The disputed tract was contiguous to the east line of lot 33. Hence this case falls within the rule laid down in *Adams* v. *Clapp*, 87 Maine, 316, where the court construed the final clause of the statute just quoted, saying, "We think that the final clause of the section . . . . was made and intended to apply to a case where the disseizor was occupying and using a wood-lot in connection with land or a farm which he was also occupying and using adversely; and that it was not intended to apply to a case where a person enters upon land of which he holds title, and all his visible acts of ownership are done upon that land, and thereby acquire title to

a tract of wood-land although it may be contiguous to such land. It could not have been the intention of this statute to extend the doctrine of constructive disseizin thus far so as to acquire title to wood-land, or such as may be used as a wood-lot, unless it be a part of the farm which is occupied and used adversely. . : . . While the statute in question in terms obviates the necessity of fences, and provides what shall be deemed sufficient evidence of the adverse intent of the party holding it, it also extends this constructive disseizin or adverse character of the possession to that part of the land or farm which is 'a part of the same' and which 'composes the wood-land belonging to such farm and used therewith as a wood-lot' . . . . But the statute does not, either in express terms or by implication, extend this doctrine of constructive disseizin to wood-land unless it is a part of the farm thus adversely occupied and used in connection with it as a wood-lot." Plainly the statute gives no aid to the claim of title by adverse possession set up by the defendants.

The case from which we have just been quoting, *Adams* v. *Clapp*, supra, gives such a clear and concise statement of the common law rule applicable to the element which we are now discussing that we quote again. "Where it (the wood-lot) is no part of the farm adversely occupied, where the title to the farm is in the person occupying and in possession of it, then, although such wood-land may lie contiguous to it, in order to acquire title to such wood-land there must be such actual use and occupation of it, and of such unequivocal character, as will reasonably indicate to the owner visiting the premises during the statutory period, that instead of such use and occupation suggesting only occasional trespasses, they unmistakably indicate an asserted exclusive appropriation and ownership. The acts must be such as to leave no reason to inquire about intention, so notorious that the owner may be presumed to have knowledge that the occupancy is adverse." See also *Roberts* v. *Richards*, supra; *Hooper* v. *Leavitt*, 109 Maine, 70.

The evidence in this case, when carefully and impartially studied, shows that during a long period of years there had been cutting of firewood by the Whites, but the cutting over this tract of forty or fifty acres was desultory, as shown by all the witnesses, and as one witness testified it was done "where the cutting was best." There is not sufficient evidence to show any definite location, extent or

boundary of the actual cutting. It was such cutting as would suggest trespass "to the owner visiting the premises during the statutory period" rather than an "asserted exclusive appropriation and ownership."

It is the opinion of the court that by common law, as well as by statute the defendants have failed to establish title through adverse possession by virtue of their cutting of wood and timber.

### 4. FORBIDDING OTHERS TO CUT UPON THIS TRACT.

The testimony shows that on two occasions the Whites had forbidden others from cutting on this tract, but in *Hudson* v. *Coe*, 79 Maine, 83, it was held that keeping off trespassers did not constitute such an act of ownership as would establish title by adverse possession.

### 5. BALDWIN SURVEY IN 1881.

It appears that lot 34 was formerly owned by Sprague and James Adams, whose trustees on September 14, 1900, deeded to the plaintiffs' lands in Springfield, which deed, so the plaintiffs say, included the disputed tract. It further appears that in the year 1881, S. & J. Adams employed Thomas W. Baldwin, a surveyor, to define the east line of lot 33 which separated the Adams land from the land of White. In so doing Baldwin located said east line in such manner as to leave a small strip, on the west side of the disputed tract, within the limits of the White farm, but by far the greater part of the disputed tract was found to be east of the east line which Baldwin was employed to define. Much controversy arose at the trial as to whether this was or was not a re-entry upon the disputed tract by S. & J. Adams also whether adverse possession had already been acquired by the Whites so that no re-entry could be effective because the adverse possession had ripened into title, and particularly whether or not Baldwin went there for the purpose of taking possession of the land on the easterly side of the line in behalf of his principals, S. & J. Adams. This purpose of taking possession and the intent of Baldwin, became and constituted one portion of the plaintiffs' bill of exceptions.

In view of our opinion that the Whites, up to 1881, had not gained title by adverse possession it must follow that the controversy

between the parties as to Baldwin's intent, at the time of the survey, disappears from the case.

### 6. LOBLEY SURVEY IN 1913.

The defendants lay stress on the fact that in 1913 the plaintiffs employed Joseph A. Lobley to survey the lines of their land in the township in which this disputed tract is located, and in doing so Lobley ran lines which excluded this disputed rectangular tract from the larger rectangle which included 9 range 10 and 10 range 10, or lot 34 as we have already seen. From this the defendants urge, first that the plaintiffs recognized the weakness of their title to the excluded rectangle, and second that the plaintiffs abandoned the excluded rectangle and are now equitably estopped from claiming it. To the first claim here made it is a sufficient answer that the defendants, upon whom rests the burden of proving title by adverse possession, as we have already stated, must rely upon the strength of their own title rather than the weakness of the plaintiffs' title. As to abandonment we may well say here, as was said in *Phinney* v. *Gardner*, supra, that there is no opportunity for the application of the doctrine of abandonment. As was said in that case "The characteristic element of abandonment is the voluntary relinquishment of ownership, whereby the thing so dealt with ceases to be the property of any person and becomes the subject of appropriation by the first taker"—After there discussing abandonment as used in connection with personal property, inchoate and equitable rights, and incorporeal hereditaments, the court well said "at common law a perfect legal title to a corporeal hereditament cannot, it would seem, be lost by abandonment. Its very essence is inconsistent with the attributes of real estate." See also *Smith, Admr.* v. *Booth Bros.* et al, 112 Maine, at Pages 305-6. Even if the defendants' claim of abandonment, whereby this disputed tract ceased to be the property of any person and became the subject of appropriation by the first taker, were to be more seriously considered, then the abandonment was at the time of the Lobley survey in 1913 and the period between that date and the date of the writ, December 2, 1916, was far too brief to afford the defendants' title by adverse possession.

But the defendants, relying upon the incidents of the Lobley survey in 1913, present in their brief statement a somewhat elab-

orate rehearsal of matters and things whereby they claim that the plaintiffs are equitably estopped from now claiming "any of said trees or stumpage by reason of their misconduct in misleading the said Barker and the said Costley and the said defendants in manner aforesaid." The misleading misconduct thus relied upon, stated briefly, consisted in the fact that when Lobley made the survey for the plaintiffs he marked corners and lines by peculiar symbols which were and had been used by the plaintiffs to mark their corners and lines, and that the corners and lines thus marked did not include this disputed tract. The defendants do not claim that the plaintiffs made any representations, or failed to make any such to the defendants at the time when they purchased the stumpage of Hollis White, but on the contrary they expressly state that White, who was then selling the stumpage to the defendants, on June 22, 1915, when no plaintiff was present and no one present representing the plaintiff, "took Henry L. Barker and John Costley upon the land upon which said trees stood and showed them the survey marks, spotted lines and the marks upon the corner stakes, with the word Webber upon them, and informed them that he was the owner of said premises and that the said plaintiff claimed no title to the same." From these representations and conditions the defendants say they were induced to buy, and claim, as we have already stated, that the plaintiffs are now equitably estopped from claiming the trees or stumpage.

Equitable estoppel, which is another expression for estoppel in pais, is so called to distinguish from estoppel by deed or record. The general rule of law in regard to equitable estoppel in England and this country is that "a party will be concluded from denying his own acts or admissions which were expressly designed to influence the conduct of another and did so influence it, and when such denial will operate to the injury of another." *Piper* v. *Gilmore,* 49 Maine, 149. In the case from which we have just quoted the court further say: "In all the cases where an estoppel has been held to exist, it is believed that it will appear, upon examination, that there was some evidence tending to show that the party estopped had some knowledge of the rights, interest, or intentions of the other party, or of his relations to the thing to which his declarations or acts related, or that he had some intention of misleading the other

party into some action that might be prejudicial to him. In every case there will be found some degree of bad faith, either expressly designed or constructive."

The record in the case at bar fails to show that the plaintiffs had knowledge of the rights, interest, or intentions of the defendants, who now seek to invoke the law of equitable estoppel, or that they had some intention of misleading the defendants when they had the Lobley survey made. Nor does the record show bad faith, either expressly designed or constructive. It seems quite plain, from a careful study of the testimony and the rules of law applicable to the contention, that the doctrine of equitable estoppel cannot be successfully invoked by these defendants against the plaintiffs.

In view of the conclusions we have reached, it does not seem necessary to discuss the exceptions, for we are of opinion that the jury plainly misunderstood the law applicable to the case and that their verdict must not be allowed to stand. The mandate must accordingly be,

*Verdict set aside.*
*New trial granted.*
*Exceptions not considered.*