2006 ME 24

**Marion J. DOMBKOWSKI**

v.

**Edgar R. FERLAND.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Dec. 13, 2005.
Decided: March 13, 2006.

William L. Dawson Jr., Esq., Belfast, for plaintiff.

James A. Mitchell, Esq., Butler, Whittier, LaLiberty & Mitchell, L.A., Waterville, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

DANA, J.

[¶ 1] Edgar R. Ferland appeals from a judgment entered in the Superior Court (Waldo County, *Hjelm, J.*) granting Marion J. Dombkowski title by adverse possession to a disputed parcel of land to which Ferland holds record title, and enjoining Ferland from interfering with Dombkowski's use, possession, and enjoyment of the land. Ferland contends that: (1) the court erred in applying and interpreting 14 M.R.S. § 810-A (2005); (2) the court abused its discretion in admitting in evidence the entire transcript from the hearing for a preliminary injunction; and (3) there was insufficient evidence for the court to find actual possession and use of the entire disputed parcel for the twenty-year period required for an adverse possession claim. We disagree and affirm the judgment.

## I. BACKGROUND

[¶ 2] Ferland and Dombkowski own abutting parcels of real estate in Burnham. Ferland claims title to his property by virtue of a deed from the Estate of Doris Rood in 2001. Dombkowski acquired his property from his brother, Anthony, in 1994. Anthony purchased the property in 1967, at which time the Roods lived in the house next door.

[¶ 3] Dombkowski and Anthony resided in Connecticut, where they ran a pig farm.

Anthony spent his winters in Connecticut, but lived at the Burnham property much of the time during the other seasons from 1967 until his death in 1994. Dombkowski visited the Burnham property regularly to attend auctions with Anthony and buy pigs, which Dombkowski would transport back to Connecticut. Just before his death, Anthony transferred his Burnham property to Dombkowski. Dombkowski has continued to visit the property from 1994 through to the present.

[¶ 4] In 1967, the disputed area was overgrown with brush and trees. Over the course of several years, Anthony cleared this area and made it into a lawn. Anthony, or others on his behalf, maintained the lawn and kept it mowed. A gravel driveway entered onto the disputed area from the road. Since 1967, whenever Dombkowski visited the property, he would use the driveway to drive trucks onto the disputed area, where he would park them.

[¶ 5] In the early 1970s, either Anthony or the Roods erected a wire fence along the line that Dombkowski now claims separates the area of adverse possession from the portion of Ferland's property that is free from this action. In the 1980s, fir trees were planted along Dombkowski's side of the fence. There is no evidence in the record as to who planted the trees. There is no evidence in the record that the Roods or anyone other than the Dombkowskis used the disputed property in any way.

[¶ 6] In 2001, Dombkowski had a well drilled in the middle of the disputed area. Some time after that, the fence that stood along the disputed area was moved closer to Dombkowski's house, closer to where the recorded property line was.[1] When

---

1. The record does not provide evidence as to who moved the fence.

the fence was moved, it blocked the driveway, preventing Dombkowski from using the driveway.

[¶ 7]· Dombkowski testified that he thought he was the record titleholder, and had he known that he did not own the property, he would have ceased using it if asked by the true owner to do so. It is unknown what belief Anthony had about the disputed property when he cleared and maintained it over the years. In 2002, Ferland had the land surveyed, and Dombkowski realized for the first time that the disputed property was not included in his deed.

[¶ 8] On August 29, 2002, Dombkowski filed a complaint pursuant to the Maine Declaratory Judgments Act,[2] asking the court to issue a declaratory judgment regarding ownership of the disputed property. He also alleged that Ferland threatened to remove the well and he asked the court to issue preliminary and permanent injunctions prohibiting this. The court issued a preliminary injunction in April 2003, enjoining Ferland from removing or impairing Dombkowski's well.

[¶ 9] Following a jury-waived trial, the court declared Dombkowski the owner of the disputed property through adverse possession and enjoined Ferland from interfering with his use, possession, and enjoyment of the property. The court relied on 14 M.R.S. § 810–A in making its decision and concluded that although Dombkowski could not prove a claim of adverse possession under Maine's common law, he succeeded under a statutory claim of adverse possession.

## II.  ADVERSE POSSESSION

[¶ 10] Under the common law, a party claiming title by adverse possession need-ed to establish by a preponderance of the evidence that his possession and use of the property for a twenty-year period was actual, open, visible, notorious, hostile, under a claim of right, continuous, and exclusive. *See Striefel v. Charles–Keyt–Leaman P'ship*, 1999 ME 111, ¶ 6, 733 A.2d 984, 989 (outlining the elements and defining their meaning in detail). Only the hostility and claim of right elements are contested here.

### A.  Hostile and Claim of Right

[¶ 11] Although "[s]ome courts and commentators fail to distinguish between the elements of *hostility* and *claim of right*, or simply consider *hostility* to be a subset of the *claim of right* requirement[, s ]ee, e.g., Johnson v. Stanley, 96 N.C.App. 72, 384 S.E.2d 577, 579 (1989)[,] ... [u]nder Maine law, the two elements are distinct." *Striefel*, 1999 ME 111, ¶ 13 n. 7, 733 A.2d at 991.

[¶ 12] " 'Hostile' simply means that the possessor does not have the true owner's permission to be on the land, and has nothing to do with demonstrating a heated controversy or a manifestation of ill will, or that the claimant was in any sense an enemy of the owner of the servient estate." *Id.* ¶ 13, 733 A.2d at 991 (quotation marks and citation omitted). "Permission negates the element of hostility, and precludes the acquisition of title by adverse possession." *Id.* " 'Under a claim of right' means that the claimant is in possession as owner, with intent to claim the land as [its] own, and not in recognition of or subordination to [the] record title owner." *Id.* ¶ 14, 733 A.2d at 991 (quotation marks omitted).

2.  We have stated that Maine's Declaratory Judgments Act, 14 M.R.S. §§ 5951–5963 (2005), provides an appropriate form of ac-tion for determining rights in real property. *See Hodgdon v. Campbell,* 411 A.2d 667, 669–70 (Me.1980).

[¶ 13] Under Maine's common law, as part of the claim of right element, we have historically examined the subjective intentions of the person claiming adverse possession. *See Preble v. Me. Cent. R.R. Co.,* 85 Me. 260, 264, 27 A. 149, 150 (1893); *accord Emerson v. Me. Rural Missions Ass'n, Inc.,* 560 A.2d 1, 3 (Me.1989); *McMullen v. Dowley,* 483 A.2d 698, 700 (Me.1984). Under this approach, which is considered the minority rule in the country, "one who by mistake occupies ... land not covered by his deed with no intention to claim title beyond his actual boundary wherever that may be, does not thereby acquire title by adverse possession to land beyond the true line." *Preble,* 85 Me. at 264, 27 A. at 150; *see also McMullen,* 483 A.2d at 700 ("[If] the occupier intend[s] to hold the property only if he were in fact legally entitled to it[, the] occupation [is] 'conditional' and [cannot] form the basis of an adverse possession claim.").[3] The majority rule in the country is based on *French v. Pearce,* 8 Conn. 439 (1831), and recognizes that the possessor's mistaken belief does not defeat a claim of adverse possession. *See* 16 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 91.05[2] (Michael Allan Wolf ed., 2005).

[¶ 14] In 1993, the Legislature enacted 14 M.R.S. § 810–A, which provides:

§ 810–A. Mistake of boundary line establishes hostility

If a person takes possession of land by mistake as to the location of the true boundary line and possession of the land in dispute is *open* and *notorious, under claim of right,* and *continuous* for the statutory period, the *hostile* nature of the claim is established and no further

evidence of the knowledge or intention of the person in possession is required. (Emphasis added.)

[¶ 15] In *Striefel,* we noted that the Legislature inartfully used the terms "hostile" and "claim of right" in this provision because a claimant's mistake as to the location of the true boundary pertains to the claim of right element, not to the hostile element. 1999 ME 111, ¶ 15 n. 9, 733 A.2d at 992. However, that case did not present us with the opportunity to definitively interpret section 810–A.

[¶ 16] Here, the court interpreted section 810–A as eliminating the common law inquiry into the subjective intent of the adverse possession claimant. Thus, although the court found that Dombkowski's occupation of the disputed area was "conditional" because he mistakenly believed it was his, the court determined that because section 810–A does not require inquiry into the subjective intent of the claimant, Dombkowski established adverse possession by satisfying the other elements of his claim.

B. One Claim or Two?

[¶ 17] Ferland argues that the court should not have relied on 14 M.R.S. § 810–A because Dombkowski failed to make a statutory claim of adverse possession because there are no references in his complaint to the statute. Thus, he contends that the court erred in applying the statute. He argues that this is a common law claim only and that section 810–A does not apply to common law claims for adverse possession.

[¶ 18] Ferland relies on language in dictum from *Striefel* to support his argument that section 810–A does not apply to a

---

**3.** *Compare* the intent that was conditional in *Preble v. Me. Cent. R.R. Co.,* 85 Me. 260, 266–67, 27 A. 149, 151 (1893), *with* the intent that was not conditional in *Emerson v. Me. Rural Missions Ass'n, Inc.,* 560 A.2d 1, 3 (Me.1989).

common law claim. In a footnote in that case, we stated, "[s]ince we apply the common law doctrine of adverse possession in the present case, we need not apply the statutory provisions or further address ... section 810–A." 1999 ME 111, ¶ 15 n. 9, 733 A.2d at 993. Ferland misapprehends this statement as meaning that there are two distinct claims for adverse possession. In fact, we did not need to apply section 810–A in *Striefel* because there was no indication in the record that the adverse claimants possessed and used the parcel under a mistaken assumption of ownership. Thus, the statute was not necessary to the decision.

[¶ 19] Although we recognize that statements in our opinions may have allowed the inference that there are two separate claims for adverse possession, *see id.* ¶ 5, 733 A.2d at 989 (stating that title in real property by adverse possession may be established either under the common law or pursuant to statutory provisions), there is only one claim—the common law claim as amended by the Legislature. The Legislature expressed its intent to change only one part of the common law with this provision. *See* L.D. 1076, Statement of Fact (116th Legis.1993). Therefore, section 810–A amends the common law claim for adverse possession, and the court did not err in applying it here.

### C. Interpreting 14 M.R.S. § 810–A

[¶ 20] Ferland also argues that the court erred in interpreting section 810–A to eliminate the common law element of claim of right. He contends that, in *Strie-*

*fel*, we concluded that the wording of section 810–A was ambiguous and did not accomplish the result the Legislature intended.[4]

[¶ 21] Ferland again misapprehends our discussion in *Striefel*. Although we recognized that an ambiguity exists due to the inartful wording of section 810–A, we did not reach a conclusion as to how section 810–A should be interpreted because there was no issue of mistaken possession in that case.[5]

[¶ 22] We review questions of statutory interpretation as legal issues subject to de novo review. *Ashe v. Enter. Rent–A–Car,* 2003 ME 147, ¶ 7, 838 A.2d 1157, 1159. "In interpreting [a] statute, we 'seek to effectuate the intent of the Legislature, which is ordinarily gleaned from the plain language of the statute.'" *Irving Pulp & Paper, Ltd. v. State Tax Assessor,* 2005 ME 96, ¶ 8, 879 A.2d 15, 18 (quoting *Foster v. State Tax Assessor,* 1998 ME 205, ¶ 7, 716 A.2d 1012, 1014). "We must consider[ ] the language in the context of the whole statutory scheme and construe the statute to avoid absurd, illogical, or inconsistent results." *Id.* (quotation marks and citation omitted) (alteration in original). "Only if the language of a statute is ambiguous will we look beyond it to the legislative history or other external indicia of legislative intent." *Id.*

[¶ 23] We acknowledged, in *Striefel,* that section 810–A contains an ambiguity and, although we did not resolve the ambiguity,

---

4. Ferland also argues that because the court did not find that the language was ambiguous, it should not have looked to the legislative intent. Although the court did not expressly find section 810–A ambiguous on its face before it looked to the legislative intent, it referenced our discussion of section 810–A in *Striefel* and noted that the bare language of

the statute confused the terms "hostile" and "claim of right."

5. "[W]e need not apply the statutory provisions or further address the ambiguities of section 810–A." *Striefel v. Charles–Keyt–Leaman P'ship,* 1999 ME 111, ¶ 15 n. 9, 733 A.2d 984, 993.

we discussed the legislative intent of section 810–A at length:

> The Legislature in drafting section 810–A apparently attempted by legislative fiat to depart from the Maine rule, at least with respect to the statutory provisions. According to the statement of fact accompanying the bill that resulted in the enactment of section 810–A:
>
>> This bill adopts the position now held by a majority of jurisdictions that, if the occupancy of land beyond a true boundary line is *actual, open, notorious* and *continuous*, it is *hostile* and *adverse* even though the original occupancy took place due to ignorance, inadvertence or mistake, without the intention to claim lands of another. It thus overrules the positions adopted by the Maine courts in [*Preble v. Maine Cent. R.R. Co.*, 85 Me. 260, 27 A. 149 (Me.1893),] and [*Landry v. Giguere*, 127 Me. 264, 143 A. 1 (1928),] that "intention to hold only to [the] true boundary wherever that boundary might be defeats [a] claim of one seeking title by adverse possession to land beyond the true boundary." [*McMullen v. Dowley*, 483 A.2d 698, 700 (Me.1984) (citing *Landry* ).]
>
> L.D. 1076, Statement of Fact (116th Legis.1993) (*emphasis added*). No legislative debate or committee report accompanied the bill. The only written statement in support of the enactment was from the Central Maine Title Company on behalf of the Maine Association of Realtors, which briefly stated that the provision would "help clarify the law" and align Maine with the majority of states.
>
> "Hostile" and "claim of right" are terms of art. The Legislature, in its purported attempt to "overrule" the Maine rule, inartfully provided that a mistake as to the location of the true boundary line does not preclude a finding of *hostility* if the adverse claimant takes possession of the land, *inter alia*, under a *claim of right*. See 14 M.R.S. 14 § 810–A. The so-called Maine rule, however, primarily pertains to the *claim of right requirement*, rather than the requirement of *hostility*.

*Striefel*, 1999 ME 111, ¶ 15 n. 9, 733 A.2d at 992 (alteration in original).[6]

[¶ 24] Although the Legislature confused the terms "hostile" and "claim of right" in drafting section 810–A, the statement of fact accompanying the bill explicitly states that the Legislature intended to eliminate the intent requirement for adverse possession claims. *See* L.D. 1076, Statement of Fact (116th Legis.1993). Because we seek to effectuate the intent of the Legislature, we hold that the intent requirement for adverse possession claims is eliminated. To the extent that our earlier cases adopted the position that "intention to hold only to [the] true boundary wherever that boundary might be defeats [a] claim of one

---

**6.** We have cited to 14 M.R.S. § 810–A (2005) in three cases. In each of these cases, although we did not apply section 810–A, we noted that with the enactment of section 810–A, the Legislature removed the requirement that an adverse possession claimant have the specific intent to claim the land of another. *See Baptist Youth Camp v. Robinson*, 1998 ME 175, ¶ 13, 714 A.2d 809, 814; *Crosby v. Baizley*, 642 A.2d 150, 153 n. 2 (Me.1994); *Cates v. Smith*, 636 A.2d 986, 988 n. 4 (Me.1994). In *Baptist Youth Camp*, we did not have to examine the intentions of the claimants because they failed to establish other elements of adverse possession. 1998 ME 175, ¶ 13, 714 A.2d at 814. In *Cates* and *Crosby*, we did not apply section 810–A because both actions were filed prior to the effective date of the legislation. *Crosby*, 642 A.2d at 153 n. 2; *Cates*, 636 A.2d at 988 n. 4. Thus, the claimants in those cases were required to establish intent based on an unconditional claim of right.

seeking title by adverse possession to land beyond the true boundary[,]" *McMullen,* 483 A.2d at 700, they are overruled.

## III. ADMISSION OF TRANSCRIPT FROM PRELIMINARY INJUNCTION

[¶ 25] Ferland argues that the court erred in admitting in evidence, at trial, the entire transcript from the hearing for the preliminary injunction. He argues that M.R. Civ. P. 65(b)(2) limits, at trial, the admission of evidence received at the pre-liminary hearing to evidence that would be admissible upon the trial of the merits, and he contends that the court made ·no effort to distinguish the admissible from the inadmissible evidence contained in the transcript. Further, he argues that the rule restricts the use of such evidence only for the purpose of determining whether or not a permanent injunction should issue and not for the purpose of determining whether Dombkowski satisfied all of the elements of adverse possession. He con-tends that the trial court should have dis-tinguished the purpose for its admission. Finally, he argues that Dombkowski intro-duced repetitive testimony at trial by testi-fying in addition to offering the transcript.

[¶ 26] M.R. Civ. P. 65(b)(2) provides, in pertinent part:

Before or after the commencement of the hearing of an application for a pre-liminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the mer-

its becomes part of the record on the trial and need not be repeated upon the trial.[7]

[¶ 27] Although the rule limits the evidence to that which would be admis-sible at a trial on the merits, Ferland did not challenge the admissibility of any par-ticular portion of the transcript at the trial, nor does he direct us to any inadmissible portion of the transcript. Further, noth-ing in the rule limits admission of the evidence to the motion for a permanent injunction as opposed to a trial on the merits. Finally, although M.R. Civ. P. 65(b)(2) states that testimony from an ear-lier hearing need not be repeated, nothing in the rule prevents the repetition of such testimony when allowed by the court and important to the presentation of the case.

## IV. SUFFICIENCY OF THE EVIDENCE

[¶ 28] "Adverse possession presents a mixed question of law and fact." *Striefel,* 1999 ME 111, ¶ 7, 733 A.2d at 989. "[W]hether the necessary facts exist is for the trier of fact, but whether those facts constitute adverse possession is an issue of law for the court to decide." *Id.* (quota-tion marks omitted). We will uphold the court's determination of the facts underly-ing an adverse possession claim if the find-ings are supported by credible evidence in the record. *Id.* " 'It is primarily for the factfinder to judge the credibility of wit-nesses and to consider the weight and significance of any other evidence. As such, [we] must give due regard to the trier of fact's determinations on credibility, weight[,] and significance of evidence.' " *Cates v. Smith,* 636 A.2d 986, 988 (Me.

---

**7.** *See also Clark v. Goodridge,* 632 A.2d 125, 127 (Me.1993) (holding that, at a trial on the merits for illegal eviction and unlawful entry, the trial court acted within its discretion in

(1) declining to rehear evidence presented at an earlier hearing on a motion to dissolve a temporary restraining order, "and (2) relying on that evidence to formulate its decision").

607

1994) (quoting *Tonge v. Waterville Realty Corp.*, 448 A.2d 902, 905 (Me.1982)).

[¶ 29] In order to establish a claim for adverse possession, "[a] claimant must prove that [his] possession and use satisfied each of the [elements of adverse possession] simultaneously for a period of at least twenty years." *Striefel*, 1999 ME 111, ¶ 18, 733 A.2d at 993 (quotation marks omitted); *see also* 14 M.R.S. § 801 (2005).

[¶ 30] Ferland argues that the evidence was insufficient for the court to find the twenty-year prescriptive period satisfied for the entire parcel because the clearing process was incremental over many years, and there was no evidence specifying exactly when the adverse possession began for each incremental clearing.

[¶ 31] Credible evidence in the record supports the court's determination that the twenty-year prescriptive period for the entire parcel was satisfied. Beginning in the late sixties to early seventies, Anthony cleared the disputed land, maintained the lawn, and used part of it as a driveway. The area was fenced in from around 1970 until sometime during or after 2001.

The entry is:

Judgment affirmed.