2008 ME 120

**Ruth W. WEEKS et al.**

v.

**John KRYSA et al.**[1]

Supreme Judicial Court of Maine.

Submitted on Briefs: May 29, 2008.

Decided: July 17, 2008.

---

1. Forrest Estes, Westie Krysa's grandfather, was the first named defendant in the action before the Superior Court. However, he did not join in the appeal. The case name has been changed to reflect the parties to this appeal.

Sandra L. Guay, Esq., Michael J. O'Toole, Esq., Woodman Edmands Danylik & Austin, P.A., Biddeford, ME, for John J. Krysa, IV and Westie G. Krysa.

Alan J. Perry, Kurtz & Perry, South Paris, ME, for Ruth W. Weeks, Arnold N. Weeks, Jr., Alan Weeks, Suzanne Hoyt, Thomas Hutchinson, Bruce Hutchinson and Rebecca Joyce.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] John and Westie Krysa appeal from a judgment of the Superior Court (York County, *Brennan, J.*), entered after a non-jury trial, concluding that the Weeks and Hutchinson families (the Weekses) established title to an undeveloped, waterfront lot by adverse possession. The Krysas argue that the court erred in concluding that the Weekses' use and possession of the disputed parcel satisfied the elements of adverse possession. Because the evidence in the record, construed most favorably to the Superior Court's findings, does not support essential elements of the adverse possession claim, we vacate and remand for entry of judgment for the Krysas on the adverse possession claim.

## I. ISSUE FOR DECISION

[¶ 2] This appeal presents the question of when and under what circumstances will an abutter's casual, seasonal, use of an undeveloped waterfront lot ripen into title by adverse possession sufficient to exclude the true owner.

## II. CASE HISTORY

[¶ 3] Forrest Estes and John and Westie Krysa are the owners of record of an

undeveloped lot (disputed lot) on the shore of Little Ossippee Lake in Waterboro. The lot has seventy-five feet of frontage on the lake. It is bordered on its other three sides by the Weeks lot, which is owned by the Weeks and Hutchinson families. One sideline is one hundred feet long, the other sideline is fifty-one feet long, and the back line is eighty-five feet long.

[¶ 4] In November 2004, the Weekses filed a complaint for declaratory judgment against the Krysas, pursuant to 14 M.R.S. 5951–5963 (2007), seeking, among other relief, title to the disputed lot by common law adverse possession (Count 1) and statutory adverse possession, pursuant to 14 M.R.S. 815–816 (2007) (Counts 3 and 4).[2] The Krysas filed an answer and counterclaim, seeking an easement over the Weeks lot, damages for the Weekses' trespass, and injunctive relief. The Krysas later filed an amended counterclaim, requesting reformation of the deed.

[¶ 5] The court held a bench trial at which the parties presented evidence supporting the following facts, which are largely undisputed. In 1920, the disputed lot and the Weeks lot were part of a larger tract of land owned by William H. Webber. Webber conveyed the disputed lot to Clarence Fluent in 1920 without expressly granting a right-of-way for Fluent to access the lot. However, in 1924, when Webber conveyed his remaining land, including what is now the Weeks lot, to Maria Gray Kimball, he expressly reserved a right-of-way across the Weeks lot for Fluent to use to access the disputed lot. In 1925, Fluent conveyed the disputed lot and the right-of-way to the public road to Alice Webber.[3] Alice Webber's family owned a farm on a separate nearby lot. The family used the disputed lot for pasturing cattle and harvesting ice until the great fire of 1947 destroyed their farm. Alice Webber's family returned to the disputed lot between the early 1950s and 2004, approximately once or twice a year. These visits involved walking around, inspecting the property, and picking berries.

[¶ 6] Alice Webber died owning the disputed lot. In 1983, her personal representative conveyed the disputed lot to Alice Webber's children, including her son, Forrest Estes. In 2004, John and Westie Krysa, Forrest Estes's step-granddaughter and step-grandson-in-law,[4] bought out the other family members' interests, except Forrest Estes's, in the disputed lot. About that time, the Krysas began clearing brush and fallen trees on the disputed lot, prompting the Weeks to bring the present action.

[¶ 7] The Weeks and Hutchinson families purchased their lot from Kimball in 1950, subject to a right-of-way for the benefit of the disputed lot.[5] In the early 1950s, they built two camps and a driveway on the Weeks lot. They built the

---

2. The Weekses' complaint also requested: a declaration that no easement for access over the Weeks lot was ever created (Count 2); damages for common law trespass (Count 5); damages for statutory trespass (Count 6); and a preliminary injunction prohibiting the Krysas from future trespass (Count 7).

3. Alice Webber's deed described the right-of-way as "the same right of way heretofore reserved in the deed of William H. Webber to said Maria Gray Kimball."

4. Forrest Estes's step-daughter is Susan Brown. Westie and John Krysa are Brown's daughter and son-in-law, respectively.

5. Kimball conveyed the Weeks lot to Arnold Weeks and Alfred Hutchinson in 1950, "[s]ubject however to a right of way for the use of the said Clarence Fluent." Arnold Weeks and Alfred Hutchinson conveyed the lot to the present owners, who are also family members, in 1988 by a warranty deed that states, "[f]or title reference see Deed of Maria Gray Kimball...."

camps using wood they cut from surrounding property, making no distinction between their lot and the disputed lot. From the early 1950s to the present, the Weekses occupied the camps on weekends during the spring and fall and throughout the summer months. After hurricanes in 1954, the Weekses removed fallen trees and other debris from their property and the disputed lot.

[¶ 8] Edith Ann Hutchinson testified that she occupied the property seasonally throughout this period, that she did not know the approximate location of the disputed lot lines, and that she, and her children who played on the property, made no distinction between their property and the disputed lot. She testified that she never saw Alice Webber or anyone else on the disputed lot, with the exception of one incident in 1981. During at least the 1970s, the Hutchinsons maintained a garden, which likely encroached onto the disputed lot. Throughout the summers, the Weeks children played on the disputed lot; they used it for making forts and playing "cowboys and Indians," for accessing the water to fish or look for turtles, and as a short-cut to neighboring cottages and the local convenience store. The Weekses paid taxes on both their lot and the disputed lot from 1950 to approximately 1988.

[¶ 9] Several adjacent property owners testified that they had been seasonal residents for periods in excess of thirty years and had seen the disputed lot used only by the Weekses. One adjacent lot owner described the Weekses' use of the property as recreational, just like everybody else in the area. He and others also testified that the property was known, by reputation in the neighborhood, as the "Weeks and Hutchinson" lot. The Weekses' next-door neighbor, also a seasonal resident for ap-proximately thirty years, testified that she called the Weekses the one time she saw a stranger on the property.

[¶ 10] At the conclusion of the hearing, the court visited the site. The court found that the Weekses' use and possession of the disputed lot was actual, open, notorious, continuous, hostile, and exclusive for at least twenty years and entered judgment for the Weekses on their claims of common law and statutory adverse possession, pursuant to 14 M.R.S. 815 (Counts 1 and 3). The court awarded the Weekses $1 as nominal damages for common law trespass (Count 5); enjoined the Krysas from entering the disputed lot (Count 7); and declared the remaining counts moot (Counts 2, 4, 6). The Krysas filed this appeal.

## III. STANDARD OF REVIEW

[¶ 11] "Adverse possession presents a mixed question of law and fact." *Dombkowski v. Ferland,* 2006 ME 24, ¶ 28, 893 A.2d 599, 606 (quoting *Striefel v. Charles–Keyt–Leaman P'ship,* 1999 ME 111, ¶ 7, 733 A.2d 984, 989). "[W]hether the necessary facts exist is for the trier of fact, but whether those facts constitute adverse possession is an issue of law for the court to decide." *Id.* When, as in this case, no party requests additional findings of fact pursuant to M.R. Civ. P. 52(a), we will infer that the court made all findings necessary to support its conclusions, and we will review the court's express and inferred findings of fact for clear error. *D'Angelo v. McNutt,* 2005 ME 31, ¶ 6, 868 A.2d 239, 242. Thus, we will affirm the trial court's explicit and inferred findings of fact regarding adverse possession so long as they are supported by competent evidence.[6] *Id.*

---

**6.** "This standard, while highly deferential to the trial court's findings, is not as deferential as the standard applied when the trial court finds in favor of the party who does not bear

[¶ 12] A party claiming title by adverse possession has the burden of proving, by a preponderance of the evidence, that possession and use of the property was (1) actual; (2) open; (3) visible; (4) notorious; (5) hostile; (6) under a claim of right; (7) continuous; (8) exclusive; and (9) for a duration exceeding the twenty-year limitations period. *Wood v. Bell,* 2006 ME 98, ¶ 12, 902 A.2d 843, 848; *Dombkowski,* 2006 ME 24, ¶ 10, 893 A.2d at 602.

[¶ 13] The elements of adverse possession must be established by clear proof of acts and conduct sufficient to put a person of ordinary prudence, and particularly the true owner, on notice that the land in question is actually, visibly, and exclusively held by a claimant "in antagonistic purpose." *Falvo v. Pejepscot Indus. Park, Inc.,* 1997 ME 66, ¶ 8, 691 A.2d 1240, 1243. "Whether specific acts are sufficient to establish the elements of adverse possession can only be resolved in light of the nature of the land, the uses to which it can be put, its surroundings, and various other circumstances." *Id.* (quotation marks omitted). See also *Webber v. Barker Lumber Co.,* 121 Me. 259, 264, 116 A. 586, 588 (1922), in which we stated:

> For adverse possession, to create title, does not consist alone of mental intentions but must also be based on the existence of physical facts which openly evince a purpose to hold dominion over the land in hostility to the title of the real owner, and such as will give notice of such hostile intent.

## IV. ANALYSIS OF ISSUES

[¶ 14] The disputed lot is a vacant shorefront lot in an area of seasonal cottages on small lots. The lot has not been significantly used or maintained by its owners since the farm that used the lot was destroyed in the 1947 fire. However, an owner's use or lack of use of a vacant or undeveloped lot is not an element of an adverse possession claim.

[¶ 15] Maine has a tradition of acquiescence in access to nonposted fields and woodlands by abutters and by the public. *Lyons v. Baptist Sch. of Christian Training,* 2002 ME 137, ¶¶ 14, 19, 804 A.2d 364, 369, 370. Pursuant to our open lands tradition, recreational use of unposted open fields or woodlands and any ways through them are presumed permissive and do not diminish the rights of the owner in the land. *Id.* ¶ 19, 804 A.2d at 370; *Town of Manchester v. Augusta Country Club,* 477 A.2d 1124, 1130 (Me.1984).

[¶ 16] Thus, an abutter's children playing on land, or persons crossing a lot to access the shorefront, other lots, or a local store, are not acts that demonstrate an intent to displace or limit the true owners of the land, and such acts do not provide an absent owner adequate notice that the owner's property rights are in jeopardy. *Lyons,* 2002 ME 137, ¶¶ 26–30, 804 A.2d at 372–73 (discussing what actions demonstrate intent to displace or limit the true owners and provide adequate notice). "To demonstrate adverse use, a claimant must show disregard of the owner's claim entirely and use of the land as though the claimant owned the property." *Id.* For lots on great ponds, such as Little Ossippee Lake, there is a right to cross for access to the lake for fishing or bird hunting that has existed since colonial times. *See Barrows v. McDermott,* 73 Me. 441,

---

the burden of proof." *D'Angelo v. McNutt,* 2005 ME 31, ¶ 6 n. 5, 868 A.2d 239, 242 (citing *Jordan v. Shea,* 2002 ME 36, ¶ 22, 791 A.2d 116, 122 (stating this Court will vacate the Superior Court's conclusion that the party failed to establish easement by prescription only if the evidence clearly compelled a contrary holding)).

447–52 (1882). Alleged regular crossings of lots bordering great ponds, even for a period of thirty-five years, creates no prescriptive rights because no compromise of the owner's fee may be inferred from such uses. *Id.*

[¶ 17] Here, neither the trial court's findings nor any testimony in the record supports a view that children playing on the disputed lot or people crossing the lot to access the lake or other properties, demonstrated a hostile intent to displace the owner that was sufficient to notify the owner that the abutters' use of the land was placing the owner's property rights in jeopardy. Seasonal playing on and crossing over a lot, without more, does not demonstrate the necessary notoriety or hostility to put the true owner on notice or support an adverse possession finding.

[¶ 18] The court also found that the owners of the Weeks lot "maintained a garden which likely encroached on" the disputed lot. This finding is consistent with an abutter's equivocal testimony as to the location of the garden. This "garden" evidence cannot support a finding "by clear proof[ ] of acts and conduct" that the gardener intended to displace the owner of the disputed lot or put the owner on notice that the owner's property rights were in jeopardy. *See Falvo,* 1997 ME 66, ¶ 8, 691 A.2d at 1243. Occasional encroachments, even including pasturing cattle on property and creating a brush fence to secure them, are not acts of sufficient notoriety to support an adverse possession claim. *Webber,* 121 Me. at 262–65, 116 A. at 587–88.[7]

[¶ 19] In addition, there was evidence that after storms and on a few other occasions, the Weeks lot owners may have cut trees and cleared some brush on the disputed lot. Helping to clean up neighboring property, without more, does not demonstrate hostility or intent to displace the true owner. Occasional tree and brush cutting does not support an adverse possession finding. *Webber,* 121 Me. at 265–67, 116 A. at 588–89.

[¶ 20] Finally, although not addressed by the trial court, there was evidence that for some years prior to 1988, the Weeks lot owners paid taxes on the disputed lot. Payment of taxes for some period of time, abandoned some time ago, may be relevant in considering the Weekses' intent while paying taxes, but paying taxes is not evidence of possession or any act to put the owner on notice that their interest in the property is threatened. *See Holden v. Page,* 118 Me. 242, 245–46, 107 A. 492, 494 (1919).

> In an action involving title the mere fact that taxes are assessed against a person in possession of land is utterly inconsequential. At most it shows the opinion of the assessors in reference to the title and their opinion is immaterial. . . . Payment of taxes upon land is not evidence of possession.[8]

*Id.*

[¶ 21] In summary, the evidence in the record is insufficient to support the trial court's finding that the Weekses' claim of

---

7. The *Webber* precedent is particularly significant because we vacated a finding of adverse possession by the trial court, holding that evidence of fencing, pasturing cattle, and occasional cutting of timber on otherwise undeveloped land was insufficient to support an adverse possession finding. *Webber v. Barker Lumber Co.,* 121 Me. 259, 262–67, 116 A. 586, 587–89 (1922).

8. Payment of a tax upon land may be evidence of a claim of title, but such payment becomes significant only if it is known to and acquiesced in by the true owner. *Holden v. Page,* 118 Me. 242, 246, 107 A. 492, 494 (1919).

adverse possession was proved. The entry is:

Judgment vacated. Remanded for entry of judgment for the Krysas.

