2011 ME 32

**Robert FLAHERTY et al.**

v.

**Helen MUTHER et al.**

Supreme Judicial Court of Maine.

Argued: Nov. 10, 2010.
Decided: March 22, 2011.

See also 968 A.2d 539.

644 

James A. Billings, Esq. (orally), Walter F. McKee, Esq., Lipman, Katz & McKee, PA, Augusta, ME, for Helen Muther and Paul Woods.

Philip P. Mancini, Esq., Alexander W. Saksen, Esq. (orally), Drummond & Drummond, LLP, Portland, ME, for the Broad Cove Shore Association.

Thomas R. McNaboe, Esq., Cumberland Foreside, ME, Andre G. Duchette, Esq., Taylor, McCormack & Frame, LLC, Stephen D. Bither, Esq. (orally), Portland, ME, for the J–Lot owners.

Janet T. Mills, Attorney General, Paul Stern, Dep. Atty. Gen. (orally), Augusta, ME, for the State of Maine.

Sidney St. F. Thaxter, Esq. (orally), David P. Silk, Esq., Susan E. Schorr, Esq., Curtis Thaxter Stevens Broder & Micoleau LLC, Portland, ME, for amicus curiae Sidney St. F. Thaxter.

Neal L. Weinstein, Esq., Old Orchard Beach, ME, for amicus curiae The Surfrider Foundation.

Amicus curiae Orlando Delogu, Esq., Portland, ME, pro se.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] This case centers on a right-of-way over a private house lot that provides access to a small beach in Cape Elizabeth. The owners of the house lot, Helen Muther and Paul Woods, individually and as trustees of the Buffett Coastal Trust, appeal from a judgment entered in the Superior Court (Cumberland County, *Crowley, J.*) in favor of the owners of eighteen neighboring properties (the J–Lot owners) and the Broad Cove Shore Association.[1]

---

1. The Broad Cove Shore Association refers collectively to the 1962 Broad Cove Shore Association, the New Broad Cove Shore Association, the 2005 Broad Cove Shore Association, and the Merged Broad Cove Shore Association, all of which are third-party defendants in this case.

Muther and Woods contend that the court erred by (1) granting a summary judgment that declared that the J–Lot owners were not bound by an earlier settlement agreement between Muther and Woods and the Association; (2) granting a summary judgment in favor of the Association on Muther and Woods's claims of indemnification, fraud, and implied warranty of authority related to the settlement agreement; (3) construing the scope of an easement to allow the J–Lot owners access to the intertidal land [2] for general recreational purposes; (4) determining that a gate erected on the easement as part of the settlement agreement and surveillance cameras unreasonably interfered with the J–Lot owners' use of the easement; (5) allowing the State to intervene; and (6) awarding costs and expenses to some of the J–Lot owners.

[¶ 2] The J–Lot owners cross-appeal from a judgment entered by the court after a bench trial (1) preventing them from using the easement to access the upland [3] of Muther and Woods's lot and an adjoining lot; and (2) declaring that they had not acquired prescriptive rights to Muther and Woods's upland. In addition, the State, as an intervenor, cross-appeals from a judgment declaring that the public's rights to use the intertidal land in front of Muther and Woods's property are limited to fishing, fowling, and navigation.

[¶ 3] We affirm the judgment in all respects, except that we vacate the judgment with respect to the unreasonableness of the gate and cameras on the easement and the award of costs, and we dismiss the appeal as to the award of attorney fees as interlocutory.

## I. BACKGROUND

[¶ 4] Due to an extensive procedural history and the number of issues addressed on appeal, the facts recited here are lengthy. We view the summary judgment record in the light most favorable to the nonprevailing party, *Kurtz & Perry, PA. v. Emerson,* 2010 ME 107, ¶ 15, 8 A.3d 677, 680, and the trial record in the light most favorable to the prevailing party, *Batchelder v. Realty Res. Hospitality, LLC,* 2007 ME 17, ¶ 3, 914 A.2d 1116, 1118.

### A. The Parties and Properties

[¶ 5] Muther and Woods, as trustees of the Buffett Coastal Trust, own oceanfront property in a subdivision in Cape Elizabeth; their property is designated as Lot J–46 on a recorded 1970 subdivision plan. They began renting Lot J–46 in 1999 before acquiring the property in 2004. The 1967 deed that conveyed Lot J–46 to Alan Balfour, the person who created the J–Lot subdivision, described Lot J–46 as extending "to the shore of the Atlantic Ocean." As a consequence of that language, the court concluded that Muther and Woods's land extends only to the mean high watermark.[4] *See Hodgdon v. Campbell,* 411 A.2d 667, 672 (Me.1980). The record does not indicate who holds title to the intertidal land in front of Lot J–46. The 1970 plan also depicts nineteen [5] other lots designated J–27 through J–45 (the J–Lots) and a twenty-foot-wide easement over Lot J–46 that is labeled "20' Drainage & Walk-

---

**2.** Intertidal land is that part of the land that is "affected by the tides between the mean high watermark and either 100 rods seaward from the high watermark or the mean low watermark, whichever is closer to the mean high watermark." *Bell v. Town of Wells (Bell II),* 557 A.2d 168, 169 n. 3 (Me.1989) (quotation marks omitted).

**3.** The upland refers to land above the mean high watermark.

**4.** Muther and Woods do not appeal this finding.

**5.** Muther and Woods did not include the owners of Lot J–40 as third-party defendants.

way Easement." Each of the J–Lot deeds references the 1970 plan.[6]

[¶ 6] The oceanfront property to the south of Lot J–46 is owned by William Holt; it is not part of the J–Lot subdivision and is not included on the 1970 plan. Holt owns the intertidal land in front of his property. Holt is not a party to this litigation. Collectively, the dry sand upland and the intertidal land that are part of Holt's property, the dry sand upland of Lot J–46, and the intertidal land in front of Lot J–46 are known locally as Secret Beach.

[¶ 7] By virtue of their deed references to recorded subdivision plans, all of the J–Lot owners hold a twenty-foot-wide walkway easement by implication over Lot J–46 that extends to the mean high water mark of Secret Beach. The parties stipulated that all of the J–Lot owners have the same right to use the easement to access the intertidal area of Secret Beach. The 1970 plan does not specify any restrictions or conditions regarding uses of the easement or activities on Secret Beach. Nor does it address the use of a gate or surveillance equipment relative to the easement.

[¶ 8] The Broad Cove Shore Association is a nonprofit corporation that comprises approximately 243 homeowners within seven subdivision plans in Cape Elizabeth, including the J–Lot subdivision plans. Some, but not all, of the J–Lot owners are Association members.

[¶ 9] The Town of Cape Elizabeth also holds a deeded drainage easement over the same right-of-way. In 2006, for drainage purposes, the Town rearranged and placed large rocks where the easement meets the intertidal area of Secret Beach.

### B. Historical Use of the Easement and Secret Beach

[¶ 10] At trial, several witnesses testified about their use of Secret Beach around the time of the creation of the J–Lot subdivision. Bruce Balfour, who is not a J–Lot owner, regularly used the intertidal area of Secret Beach for general recreational purposes from 1969 through the early 1970s. Norman and Nancy Wulf have used the easement and the intertidal and upland portions of Secret Beach for general recreational purposes since the early 1970s. Robert Flaherty has regularly used Secret Beach for general recreational purposes since 1969.

[¶ 11] Regarding the J–Lot owners' use of Lot J–46's upland portion of Secret Beach, the court found that Mary Arnold regularly used the upland since she became a J–Lot owner in 1985 until 1995, and that the Wulfs and Flaherty have used the upland since they became J–Lot owners in 1995 and 2005, respectively.[7]

[¶ 12] Since 1999, when Woods began living at Lot J–46, he has photographed people using the easement and the intertidal land. When Muther and Woods acquired Lot J–46 in 2004, it was their intention to change the use of the easement and intertidal zone. There was no evidence showing that any person's use of the ease-

---

**6.** The deeds for Lots J–30 and J–31 reference a recorded 1969 plan; however, those lots are represented on the 1970 plan. The deeds for Lots J–32 and J–33 reference a 1991 revised plan of those two lots. As the court and the parties did throughout the proceedings, we regard the 1970 plan as pertaining to all of the J–Lots.

**7.** The J–Lot owners assert on appeal that Arnold used the upland of Lot J–46 continuously since 1985. Our review of the record reveals some factual inconsistencies between the trial testimony and the court's findings regarding who used the upland and for what period of time. However, these factual discrepancies are not material, and they do not affect our prescriptive use analysis.

ment or of Secret Beach was interfered with or challenged before 2004. The court found that since 2005, Muther and Woods have been "hyper-vigilant about monitoring the use of the easement and of Secret Beach," and Woods has confronted individuals, including J–Lot owners and their families, who were using the easement. Some J–Lot owners were frightened by their confrontations with Woods in the easement and have limited their use of the easement and Secret Beach as a result.

C. The Prior Litigation and Settlement Agreement

[¶ 13] In November 2005, Muther and Woods complained against the Association, Leslie Connolly, and Beth Hess,[8] seeking, among other remedies, a declaratory judgment to establish that Association members did not have a legal right to use the easement over Lot J–46 and that the walkway easement was appurtenant only to the J–Lots. *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 2, 968 A.2d 539, 540. In response, the Association asserted prescriptive rights to the easement.

[¶ 14] During this prior litigation, some of the J–Lot owners were not members of the Association. However, many of the J–Lot owners each contributed between $500 and $750 to a legal defense fund created by the Association.

[¶ 15] At a judicial settlement conference in November 2006, the parties reached a settlement agreement, and they read the terms of the agreement into the record at the conclusion of the settlement conference. Of the J–Lot owners, only Beth Hess attended the settlement conference. At the hearing held at the conclusion of the settlement conference, the Association's attorney represented on the record that he had "full authority on behalf of the Association" and assented to a statement that the settlement was binding on all of the Association's members.

[¶ 16] By the terms of the settlement read into the record, Muther and Woods would install a locking gate on the easement and Association members would have access to the easement through an electronic key card system. Muther and Woods would control distribution and activation of the key cards. The Association was to charge its members a $150 annual beach access fee to pay for and maintain the gate, but the fee would be waived for the J–Lot owners. The Association also "agreed to indemnify [Muther and Woods] if they are sued for an act or omission arising out of the conduct of the [Association]." Additionally, in connection with a nondisturbance clause, the attorney for Hess and Connolly stated on the record, "there's been a lot of controversy with respect to particularly Mr. Woods's approach to various easement holders and that they anticipate that part of nondisturbance includes the fact that peaceful users of the access are not gonna be photographed, approached, or questioned while they're using the easement."

[¶ 17] Although the parties agreed to reduce the agreement to a stipulated judgment, they were unable to do so. Muther and Woods amended their complaint to include a count for breach of the settlement agreement, and the court later entered a summary judgment in favor of Muther and Woods on that count, concluding that the terms of the settlement agreement as reflected in the record constituted an enforceable agreement. In its judgment, the court wrote, "the agreement reached at the settlement conference . . .

---

8. Connolly and Hess were directors of the Association. Connolly is a Cape Elizabeth resident but not a J–Lot owner; Hess is a J–Lot owner.

shall be binding upon all the parties to this suit."

[¶ 18] Several of the J–Lot owners moved to intervene. The court denied the motions to intervene, reiterating that the settlement agreement "shall be binding upon all the *parties to this suit*," including the J–Lot owners who were Association members. However, the court added:

> While the settlement agreement affects the rights of J–Lot owners ... derived from their membership in the Association, it does not affect any individually-deeded rights of any J–Lot owners not a party to this suit. The individual J–Lot owners, except for [Beth] Hess, were not named as defendants to this suit and any rights they may have separate from those derived from the Association are not affected by this suit or the resulting settlement agreement.

Emphasizing the finality of the judgment, the court stated, "Any disputes about the meaning of the terms of the settlement agreement or who is bound thereby are to be brought in a separate action." We subsequently affirmed the judgment in all respects, concluding:

> [T]he transcript of the settlement agreement, without more, conclusively establishes the existence of a binding settlement agreement as a matter of law, and subsequent disputes that arose while attempting to reduce the settlement to a stipulated judgment did not affect the authority of the court to enforce the agreement through the entry of a judgment incorporating the terms previously stipulated to by the parties.

*Id.* ¶ 8, 968 A.2d at 542.

## D. Post–Litigation Conduct

[¶ 19] In April 2008, pursuant to the terms of the settlement agreement, Woods installed a fence and a locking gate across the entrance to the easement. Woods also installed two video surveillance cameras on the easement without the consent of the J–Lot owners. In fall 2007 or spring 2008, Woods placed a fence at the end of the easement along the Lot J–46/Holt boundary. The fence prevents direct access to Holt's upland from the easement.

## E. The Present Litigation

[¶ 20] In April 2008, several of the J–Lot owners sued Muther and Woods for a declaratory judgment establishing their right to use the easement to access Secret Beach and to enjoin Muther and Woods from obstructing that right with the gate and fence. Muther and Woods brought counterclaims and a third-party complaint against all of the J–Lot owners[9] and the Association. The State later intervened to protect the public trust rights in the intertidal land.

[¶ 21] In March 2009, two groups of the J–Lot owners moved separately for summary judgment to declare, in part, that they were not bound by the settlement agreement reached in the prior litigation because (1) Muther and Woods were collaterally estopped from relitigating that issue, which the J–Lot owners argued was resolved with their unsuccessful motion to intervene in the prior litigation; and (2) with the exception of Beth Hess, none of the J–Lot owners were parties in the prior litigation or in privity with the Association. The court granted a summary judgment for the J–Lot owners, with the exception of Hess, declaring that they were not bound by the settlement agreement because they were neither parties to the prior litigation nor in privity with the Association.

---

9. With the exception of the owners of Lot J–

40. *See* note 5, above.

[¶ 22] In July 2009, the court held an eight-day bench trial to resolve issues regarding Lot J–46's eastern boundary, the scope and use of the easement, and the extent of the public's right to use intertidal lands. Based on its summary judgment regarding lack of privity between the J–Lot owners and the Association, the court excluded from evidence the prior settlement, concluding that it was not relevant to the reasonableness of the gate and the cameras on the easement.

[¶ 23] The court first found that Lot J–46 bordered the mean high water mark of the ocean and that Muther and Woods did not hold fee title to the intertidal land in front of their property. The court then concluded that the term "walkway easement," as used in the 1970 plan, was ambiguous and, over Muther and Woods's objection, considered extrinsic evidence about the historical use of the easement. The court inferred from the circumstances surrounding the creation of the easement that it was intended as a private right-of-way for J–Lot owners to access Secret Beach for general recreational purposes.

[¶ 24] Regarding interference with the use of the easement, the court concluded that the electronic gate and the surveillance cameras had to be removed because the gate was an unreasonable restriction of the J–Lot owners' access and the cameras were an unreasonable burden on their use.

[¶ 25] The court also determined that the J–Lot owners' use of the easement to access the upland portions of Lot J–46 and Holt's property overburdened the easement. With respect to the J–Lot owners' prescriptive claims, the court concluded that the J–Lot owners, as a "class of persons," failed to demonstrate twenty years of continuous use to establish prescriptive rights to the upland of Lot J–46, and it declined to reach the prescriptive claims regarding Holt's property or the intertidal land in front of Lot J–46 because neither property owner was a party to the case.

[¶ 26] · Finally, adhering to our decision in *Bell v. Town of Wells (Bell II)*, the court rejected the State's claim to expand the public trust rights in intertidal lands to include general recreational uses. 557 A.2d 168, 176 (Me.1989) (holding that the public does not have a right to use intertidal lands for general recreational purposes).

[¶ 27] In September 2009, the Association moved for summary judgment on Muther and Woods's claims of breach of indemnification, fraud, and breach of implied warranty of authority. After hearing argument on the motion, the court granted a summary judgment in favor of the Association on all three claims.

◼ [¶ 28] Muther and Woods timely appealed, and the J–Lot owners and the State cross-appealed. After the notice of appeal was filed, the court entered an order granting costs to one group of the J–Lot owners.[10]

10. The court separately entered an order indicating that it would allow attorney fees pursuant to M.R. Civ. P. 37(c) for Muther and Woods's failure to admit certain requests for admissions. The Rule 37(c) order did not determine the amount of attorney fees to be paid. Instead, it directed the J–Lot owners to file an attorney fees affidavit, and provided for Muther and Woods to file a written opposition. As a result, the Rule 37(c) attorney fee order was not a final judgment suitable for appellate review, and we dismiss this part of the appeal without addressing it further. *See Morse Bros., Inc. v. Webster*, 2001 ME 70, ¶ 13, 772 A.2d 842, 847 (stating that the final judgment rule "'saves an appellate court from deciding issues that may later be mooted by proceedings in other courts'"). The court ultimately did enter an order awarding attorney fees pursuant to Rule 37(c). That order is the subject of another appeal, which we resolve in a separate opinion. *See Flaherty v.*

## II. DISCUSSION

[¶ 29] We address the following issues seriatim: (A) the binding effect of the prior settlement agreement; (B) the claimed breach of the indemnification provision, fraud, and breach of an implied warranty of authority related to the settlement agreement; (C) the scope of the easement; (D) the reasonableness of the gate and surveillance cameras; (E) the J–Lot owners' right to access upland areas of Secret Beach; (F) the J–Lot owners' prescriptive claims to the upland of Lot J–46; (G) the public's rights to use intertidal lands; and (H) the award of costs.

### A. Binding Effect of the Settlement Agreement

[¶ 30] Muther and Woods argue that the summary judgment declaring that the J–Lot owners are not bound by the prior settlement agreement was improper because there are genuine issues of material fact regarding whether the J–Lot owners were in privity with the Association or ratified the settlement agreement. In essence, Muther and Woods contend that the settlement agreement in the prior litigation is binding on the J–Lot owners pursuant to the doctrine of res judicata.

[¶ 31] We review a court's grant of summary judgment de novo, viewing the summary judgment record in the light most favorable to the nonprevailing party to determine whether it demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 11, 989 A.2d 733, 738. "A material fact is one having the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. To avoid a summary judgment, the party opposing the summary judgment motion must establish a prima facie case for each element of its defense for which it has the burden of proof. *Reliance Nat'l Indem., v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 9, 868 A.2d 220, 225; *see also Van Houten v. Harco Constr., Inc.*, 655 A.2d 331, 333 (Me.1995) (placing the burden of establishing privity on the party asserting collateral estoppel).

[¶ 32] Res judicata bars relitigation of a dispute when "(1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been, litigated in the first action." *Tungate v. Gardner*, 2002 ME 85, ¶ 5, 797 A.2d 738, 740 (quotation marks omitted). There is no dispute that the J–Lot owners, with the exception of Beth Hess, were not parties to the prior litigation. The issue here is whether there was privity between the Association and the J–Lot owners.

[¶ 33] "[P]rivity is created when two or more persons have a mutual or successive relationship to the same rights of property." *Id.* ¶ 9, 797 A.2d at 741 (alteration in original) (quotation marks omitted). "A privity relationship generally involves a party so identified in interest with the other party that they represent one single legal right." *Dep't of Human Servs. v. Comeau*, 663 A.2d 46, 48 (Me.1995). "In order for the doctrine of privity to be invoked, the first litigation must provide substantial protection of the rights and interests of the party sought to be bound by the second." *Id.* (quotation marks omitted).

[¶ 34] In the prior litigation, the interests of the J–Lot owners differed from

those of the Association because they held deeded rights to the easement while the Association asserted only prescriptive rights to the easement. In this regard, the J–Lot owners and the Association did not have "a mutual or successive relationship to the same rights of property," *see Tungate*, 2002 ME 85, ¶ 9, 797 A.2d at 741, or a commonality of interest in "one single legal right," *see Comeau*, 663 A.2d at 48. Indeed, the court's judgment in the previous litigation, which we affirmed, did not treat the settlement agreement as binding on the J–Lot owners. *See Muther*, 2009 ME 37, ¶ 9, 968 A.2d at 542. Concluding that it was not necessary to join the J–Lot owners claiming deeded easement rights, the judgment unequivocally provided: "[T]he settlement agreement, by its terms, is binding only upon the individually named parties and Association members.... [T]he resulting judgment does not impair the ability of unnamed individuals to enforce rights that are not derived from Association membership." *Id.*

[¶ 35] Furthermore, in the context of evaluating privity between an association and its members, we recognize the importance of "whether, and to what extent, individual members participated in the earlier litigation involving the association [and] ... have authorized the association to represent their individual interests." *See Crane v. Comm'r of Dep't of Agric., Food & Rural Res.*, 602 F.Supp. 280, 285–86 (D.Me.1985) (identifying five factors to determine whether members are in privity with their association for purposes of res judicata). In this case, the J–Lot owners' lack of participation in the prior litigation is evident in their unsuccessful motions to intervene. Additionally, there is no evidence of express authorization by the J–Lot owners to bind them other than in their capacity as Association members, and the motions to intervene

suggest the absence of authorization. Muther and Woods's statement of fact asserted that, at a meeting at Beth Hess's home after the settlement conference, the J–Lot owners were informed of the terms of the settlement agreement and ratified the agreement with a round of applause. However, not all of the J–Lot owners were present at that event, and, drawing all reasonable inferences in favor of Muther and Woods, the evidence of "applause" in this informal context is not a material fact that would establish ratification. *See N. Star Capital Acquisition, LLC v. Victor*, 2009 ME 129, ¶ 8, 984 A.2d 1278, 1280; *Burdzel*, 2000 ME 84, ¶ 6, 750 A.2d at 575.

[¶ 36] The summary judgment record, viewed in the light most favorable to Muther and Woods, fails to establish a prima facie case that privity existed between the Association and the J–Lot owners. *See Reliance Nat'l Indem.*, 2005 ME 29, ¶ 9, 868 A.2d at 225. The court did not err in granting a summary judgment to the J–Lot owners declaring that they were not bound by the prior settlement agreement.

B. Indemnification, Fraud, and Implied Warranty of Authority

[¶ 37] Through claims of breach of indemnification, fraud, and breach of implied warranty of authority, Muther and Woods asserted that the Association was liable for the J–Lot owners' non-compliance with the terms of the settlement agreement. They contend that the court erred by entering summary judgment in favor of the Association on these claims.

[¶ 38] When "a defendant moves for summary judgment, the plaintiff must establish a prima facie case for each element of [the] cause of action that is properly challenged in the defendant's motion." *Curtis v. Porter*, 2001 ME 158, ¶ 8, 784 A.2d 18, 22 (italics removed) (quotation

marks omitted); *see Addy v. Jenkins*, 2009 ME 46, ¶ 8, 969 A.2d 935, 938. A defendant is entitled to a summary judgment if the evidence in the summary judgment record, if given at trial, would entitle the defendant to judgment as a matter of law. *Addy*, 2009 ME 46, ¶ 8, 969 A.2d at 938.

### 1. Indemnification

[¶ 39] Muther and Woods, as third-party plaintiffs, contend that there remain genuine issues of material fact regarding whether the Association breached the indemnification provision of the settlement agreement because the present suit arises from "an act or omission arising from the conduct of the [Association]." Specifically, Muther and Woods argue that the J–Lot owners' present claim for a prescriptive easement arises from the Association's failure to prevent its members from filing further lawsuits after it represented that it had authority to bind its members to the settlement agreement that disposed of the Association's prescriptive easement claim.

[¶ 40] "The interpretation of a contract and whether or not its terms are ambiguous are questions of law that we review de novo." *Beal*, 2010 ME 20, ¶ 26, 989 A.2d at 741. Here, the indemnification provision of the settlement agreement, as transcribed at the settlement conference, unambiguously required the Association "to indemnify [Muther and Woods] if they are sued for an act or omission arising out of the conduct of the [Association]." The Association's statement of material facts addressed only the element of breach: whether this suit arose from an act or omission of the Association. Therefore, to defeat a summary judgment motion, Muther and Woods were required to establish a prima facie case for that element. *See Curtis*, 2001 ME 158, ¶ 8, 784 A.2d at 22.

[¶ 41] Viewing the summary judgment record in the light most favorable to Muther and Woods, as the nonprevailing party, and accepting their uncontroverted statement of additional facts as true, *see id.* ¶¶ 6, 8, 784 A.2d at 21, 22, Muther and Woods did not establish that the Association had authority to control its membership to prevent further lawsuits and that it failed to exercise that authority.

[¶ 42] The record also establishes that the J–Lot owners have a deeded right to the easement that is different from the Association's claimed prescriptive right. As a result, the factual elements required to support the J–Lot owners' prescriptive claim *to the upland* of Lot J–46 in this case are different from those needed to support the Association's prescriptive claim to the easement in the prior litigation. Therefore, the J–Lot owners' present prescriptive claim arises from their independent standing to claim prescriptive rights to the upland instead of from an act or omission of the Association.

[¶ 43] Because Muther and Woods did not establish at summary judgment a prima facie case that any acts or omissions by the Association gave rise to this litigation, the court did not err by granting summary judgment in favor of the Association on Muther and Woods's claim for indemnification.

### 2. Fraud

[¶ 44] Muther and Woods also contend that at the settlement conference in the prior litigation, the Association—through its directors, Beth Hess and Leslie Connolly, and its attorney—falsely represented that it had the authority to bind all of its members, including the J–Lot owners.

[¶ 45] To withstand the Association's motion for summary judgment on fraud, Muther and Woods were required to

establish a prima facie case for the five elements of fraud by clear and convincing evidence. *See Addy,* 2009 ME 46, ¶ 8, 969 A.2d at 938; *cf. Butler v. Poulin,* 500 A.2d 257, 260 & n. 5 (Me.1985) (requiring plaintiff to establish elements of fraud by clear and convincing evidence to avoid directed verdict). The essential elements of fraud, or fraudulent misrepresentation, are

> (1) that [one party] made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing [another party] to act in reliance upon it; and (5) [the other party] justifiably relied upon the representation as true and acted upon it to [its] damage.

*Me. Eye Care Assocs. P.A. v. Gorman,* 2008 ME 36, ¶ 12, 942 A.2d 707, 711 (last alteration in original) (quotation marks omitted).

[¶ 46] The summary judgment record establishes that, at the settlement conference, the attorney for Muther and Woods stated on the record,

> Th[e] agreement will be in the form of a stipulated judgment recorded at the Registry of Deeds, and it's binding upon the individual [defendants, Beth Hess and Leslie Connolly,] but also on the [Association].... We understand that the settlement is binding upon all the members of [the Association], the so-called two hundred and forty-three lots, and that it is made with full authority as to that.

At the close of the conference, Hess, Connolly, and the attorney for the Association each acknowledged on the record that the record was a "fair representation" of the terms of the agreement and that they had "full authority on behalf of the Association to agree to the terms of this [agreement]."

[¶ 47] None of these statements establishes that the settlement is binding on the J–Lot owners to any extent beyond their status as members of the Association. Nor did Muther and Woods establish that Hess, Connolly, or the Association's attorney purported to have authority to bind the J–Lot owners in any way other than as members of the Association. To the contrary, the summary judgment record establishes that the J–Lot owners have deeded rights to the easement that are different from the prescriptive rights claimed by the Association on behalf of its members. In sum, Muther and Woods failed to establish a prima facie case that the Association made a false representation. Accordingly, the court did not err by granting summary judgment in favor of the Association on Muther and Woods's claim of fraud.

### 3. Implied Warranty of Authority

[¶ 48] Muther and Woods contend that a genuine issue of material fact remains regarding whether, at the settlement conference, the Association purported to have authority to represent its 243 household-members, including the J–Lot owners. They argue that from the provision in the settlement agreement that waived the $150 annual beach access fee for J–Lot owners it was reasonable to infer that the Association represented the J–Lot owners as deeded easement holders. They also argue that, having established this element of an implied warranty of authority claim, the burden shifted to the Association to present facts that would preclude its liability.

[¶ 49] The Restatement (Third) of Agency prescribes liability for breach of implied warranty of authority:

> A person who purports to make a contract ... with a third party on behalf of another person, lacking power to bind that person, gives an implied warranty of authority to the third party and is

subject to liability to the third party for damages for loss caused by breach of that warranty . . . , unless

> (1) the principal or purported principal ratifies the act as stated in § 4.01; or
>
> (2) the person who purports to make the contract . . . gives notice to the third party that no warranty of authority is given; or
>
> (3) the third party knows that the person who purports to make the contract . . . acts without actual authority.

Restatement (Third) of Agency § 6.10 (2006);[11] *see also Noyes v. Loring*, 55 Me. 408, 412, 413 (1867) (suggesting liability for contracts made by unauthorized agents purporting to have authority, but not specifying the form of action).

[¶ 50] As discussed above with regard to the fraud claim, Muther and Woods did not establish on the summary judgment record that Hess, Connolly, or the Association's attorney purported to have authority to bind the J–Lot owners in any way other than as members of the Association. Without an express representation of authority, no implied warranty of authority was given upon which Muther and Woods may make a claim. *See* Restatement (Third) of Agency § 6.10.

[¶ 51] However, whether the Association made an *implied* representation to Muther and Woods that it had authority to bind the J–Lot owners other than as members of the Association is "a question of fact to be determined by inferences to be drawn from the [Association's] conduct." *See* Restatement (Third) of Agency

§ 6.10, cmt. c. Although summary judgment is typically inappropriate for resolving questions of fact such as this, a plaintiff must still establish in the summary judgment record "evidence sufficient to create a question of fact," *Stanley v. Hancock Cnty. Comm'rs*, 2004 ME 157, ¶ 25, 864 A.2d 169, 178, and summary judgment is appropriate "if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825 (quotation marks omitted); *but see Curtis*, 2001 ME 158, ¶ 9, 784 A.2d at 22 ("When facts or reasonable inferences are in dispute on a material point, summary judgment may not be entered.").

[¶ 52] Here, the issue is whether it is an improbable inference that the Association was authorized to represent the J–Lot owners in a capacity other than as Association members based on the fact that, pursuant to the settlement agreement, the $150 annual beach access fees that Association members would pay would be waived for the J–Lot owners. Viewing all of the evidence in the light most favorable to Muther and Woods, it is an improbable inference that the J–Lot owners would authorize the Association to represent them in exchange for waiving a fee for a privilege that they already hold by deed. A more reasonable inference is that the Association understood that it could not charge some of its members for something that they already owned. Because the summary judgment record is insufficient to create a genuine issue of fact that the Association made an implied representa-

---

11. Although we have not adopted section 6.10 of the Restatement (Third) of Agency, we have favorably cited other sections of the Third Restatement. *See, e.g., Fitzgerald v. Hutchins*, 2009 ME 115, ¶¶ 11 & n. 4, 13, 983 A.2d 382, 386–87 (citing Restatement (Third) of Agency §§ 6.01–6.03 (2006)). Similarly, this Court has never cited to section 329 of the Restatement (Second) of Agency (1958), which was the predecessor to section 6.10 of the Restatement (Third).

tion of authority to make a binding agreement related to the J–Lot owners' deeded easement interests, the court did not err in granting summary judgment in favor of the Association on Muther and Woods's claim of implied warranty of authority.

## C. The Scope of the Easement

[¶ 53] Muther and Woods contend that the 1970 plan unambiguously defines the right-of-way as a "drainage and walkway easement" and that the court should not have considered extrinsic evidence to determine the purpose of the easement and permitted uses of the easement. They also argue that the easement should be strictly construed as a walkway that may be used only by persons residing on a J–Lot, during reasonable times, for the limited purposes of exercising the general public's right to fish, fowl, and navigate in the intertidal zone.

### 1. Purpose of the Easement

[¶ 54] Muther and Woods challenge the court's determination that the easement was created to provide the J–Lot owners with access to Secret Beach for general recreational purposes.

[¶ 55] We review de novo the construction of a deed and a plan referenced by the deed. *Green v. Lawrence,* 2005 ME 90, ¶¶ 7–8, 877 A.2d 1079, 1082. "When the purposes of an express easement are not specifically stated, a court must ascertain the objectively manifested intention of the parties [to the original conveyance] in light of circumstances in existence recently prior to the execution of the conveyance," *Fine Line, Inc. v. Blake,* 677 A.2d 1061, 1064 (Me.1996) (quotation marks omitted), as well as use of the easement and acts acquiesced to during "the years shortly after the original grant," *Guild v. Hinman,* 1997 ME 120, ¶ 9, 695 A.2d 1190, 1193. To determine the objec-

tively manifested intent of the parties, a court may consider extrinsic evidence. *Fine Line,* 677 A.2d at 1064. The objective intent of the parties is a question of fact, which we review for clear error. *See Guild,* 1997 ME 120, ¶ 7, 695 A.2d at 1193.

[¶ 56] In this case, the J–Lot owners have "an easement by implication based upon estoppel" that was established by a depiction on the 1970 plan that was labeled "20′ Drainage & Walkway Easement" and by references to that plan in the J–Lot deeds. *See Murch v. Nash,* 2004 ME 139, ¶ 12, 861 A.2d 645, 650 (quotation marks omitted). Although "20′ Drainage & Walkway Easement" may be unambiguous, it is silent as to the purpose of the easement, and the court properly considered extrinsic evidence to ascertain the purpose from the presumed intent of the parties. *See Fine Line,* 677 A.2d at 1064; *Badger v. Hill,* 404 A.2d 222, 225 (Me. 1979).

[¶ 57] Competent evidence in the record supports the court's determination that the purpose of the easement was to allow access to Secret Beach for general recreational purposes. The placement of the easement terminus at the mean high water mark of Secret Beach on the 1970 plan demonstrates that the purpose of the easement was to create access to Secret Beach. The testimony of Bruce Balfour, Robert Flaherty, Nancy Wulf, and Norman Wulf that they had regularly used Secret Beach for general recreational purposes without objection since 1969 and the early 1970s supports an inference that, just prior to and shortly after the creation of the 1970 plan and the easement, the objectively manifested intention of the parties was to create access to Secret Beach for recreational purposes. *See Guild,* 1997 ME 120, ¶ 9, 695 A.2d at 1193; *Fine Line,* 677 A.2d at 1064. The court's findings and conclusion regarding the presumed pur-

pose of the easement were not clearly erroneous.

[¶ 58] Muther and Woods correctly point out that because Alan Balfour did not own the intertidal land in front of Lot J–46 when he created the J–Lot subdivision, he could not convey a right of general recreational use of the intertidal land to the J–Lot owners. However, the fact that he did not own the intertidal land did not diminish his ability to convey an easement over Lot J–46 that provided access to Secret Beach for general recreational purposes. The easement can be properly used within that scope if the title owner of the intertidal land, who is neither a party to this litigation nor identified by the record, permits or acquiesces to those uses. *See Eaton v. Town of Wells,* 2000 ME 176, ¶ 34, 760 A.2d 232, 244.

### 2. Permitted Uses of the Easement

■ [¶ 59] Muther and Woods also challenge the court's determination that the J–Lot owners and their guests could use the easement without time restrictions and that strollers, wagons, bicycles, and wheelchairs were permitted on the "walkway" easement.

■ [¶ 60] "The scope of a deeded right of way is not necessarily unlimited," but uses may vary to allow full enjoyment of the easement, as long as changes in use are consistent with the easement's purpose and the "practical construction which the parties placed upon the deed by their conduct, by acts done by one party and acquiesced in by the other, especially when such conduct is proven to have continued for a long time." *Guild,* 1997 ME 120, ¶¶ 6, 9, 695 A.2d at 1192–93 (quotation marks omitted) (alterations omitted).

[¶ 61] The court could have properly inferred, based on extensive testimony by J–Lot owners and non-J–Lot owners about their long-time, unchallenged recreational use of Secret Beach from 1969 to 2004, that non-motorized conveyances such as strollers, wagons, bicycles, and wheelchairs were within the scope of the easement because they were incidental to pedestrian traffic and consistent with the general recreational purpose of the easement. Furthermore, neither the J–Lot deeds nor the 1970 plan placed restrictions on when the easement could be used or who could use the easement. This evidence, coupled with the inferred purpose of the easement, also supports the court's determination that there is no time restriction on use of the easement and that the J–Lot owners and a reasonable number of their guests may use the easement. *See Lakeside at Pleasant Mountain Condo. Ass'n v. Town of Bridgton,* 2009 ME 64, ¶ 18, 974 A.2d 893, 898 (holding that use of a right-of-way, granted for a resort's use, by guests and invitees staying at a resort inn was not a per se overburdening).

### D. Reasonableness of the Gate and Cameras

■ [¶ 62] Muther and Woods challenge the court's conclusion that their construction of a gate and use of video surveillance cameras place an unreasonable burden on the J–Lot owners' use of the easement. They argue that the gate and cameras do not create an unreasonable burden when balanced against their concerns about excluding trespassers from the easement and the beach. Muther and Woods also argue that the court erred by excluding evidence about some of the J–Lot owners' support of the Association in the prior litigation because the Association's agreement to have the gate is relevant to its reasonableness.

■ [¶ 63] The owner of a servient estate may "not materially impair, nor unreasonably interfere" with the use of

a right-of-way. *Morgan v. Boyes,* 65 Me. 124, 125 (1876); *see also Drummond v. Foster,* 107 Me. 401, 407, 78 A. 470, 472 (1910) (stating that a servient estate holder has the right to use its land in a manner "not inconsistent with the [dominant estate holder's] right"); *Ames v. Shaw,* 82 Me. 379, 382–83, 19 A. 856, 856 (1890) (considering the reasonableness of a gate across a right-of-way in light of the agricultural nature of the easement). Whether a gate across a right-of-way is reasonable is a mixed question of fact and law. *See Ames,* 82 Me. at 382, 19 A. at 856; *Mott v. Lombard,* 655 A.2d 362, 365 (Me.1995). We review the court's relevant factual findings for clear error and the court's legal conclusion of reasonableness de novo. *See Dombkowski v. Ferland,* 2006 ME 24, ¶ 28, 893 A.2d 599, 606; *Badger,* 404 A.2d at 228 (remanding case for factual findings related to interference with a right-of-way, and instructing the court to make legal determinations thereon).

[¶ 64] At trial, many of the J–Lot owners testified that the gate was a physical impediment that restricted or hindered their ability to pass through the easement, they could not open the gate without putting down items they were carrying, and keeping track of the key would be burdensome. Many expressed concerns that Woods would abuse his control of the gate. Most of the J–Lot owners were also averse to being videotaped by the cameras and stated that the cameras psychologically deterred them from using the easement. They also expressed concerns about improper use of images obtained through the surveillance system.

[¶ 65] Since its installation, the electronic gate system has not been operational, and the gate has remained open. Therefore, despite the J–Lot owners' concerns, there was no evidence that Woods has abused his control of the gate or that keeping track of a gate key is inconvenient. As the court recognized, this type of access system is widely used by businesses throughout the State. The record does not establish that the gate has any extraordinary functional features that would create an impediment or burden on its users that is anything but slight.

[¶ 66] On the other hand, the surveillance cameras were operational from late May 2008 until the time of the trial in July 2009. However, there was no evidence that Muther and Woods made any improper use of surveillance images.

[¶ 67] In addition, as the court found, "[t]he gate was erected after the settlement agreement reached in the prior litigation with the Association and is consistent with that agreement." The judgment entered in the previous litigation incorporated the terms of the settlement agreement, including the provision that the gate be erected. Because the judgment in this case requires the gate to be removed, Muther and Woods are placed in a position where they will be unable to comply with both judgments governing the easement.

[¶ 68] Similarly, the settlement agreement's nondisturbance requirement included that rightful users of the easement would not be photographed. Although this requirement could be construed narrowly as restricting Muther and Woods's right to take still photographs of users of the easement, or more broadly as also prohibiting all forms of photography, including images produced by video cameras, this question was not considered by the court as part of its reasonableness determination. Interpretation of the nondisturbance clause is a question that the trial court must resolve in the first instance.

[¶ 69] Because the court did not consider the parties' legal obligations arising from the judgment in the previous litigation, its reasonableness determination was

unduly narrow. Evidence related to the settlement agreement and the J–Lot owners' awareness of its terms was relevant to determining the reasonableness of the gate and the cameras, and the court abused its discretion in excluding that evidence at trial. *See Eaton,* 2000 ME 176, ¶ 44, 760 A.2d at 247 ("We review the trial court's rulings on admissibility of evidence for clear error or abuse of discretion.").

[¶ 70] Because the J–Lot owners' concerns about inconveniences created by a locked gate and the potential abuses related to control of the gate and use of surveillance images were speculative, those findings do not support a legal conclusion that the gate and the cameras unreasonably interfered with their use of the easement.[12] *See Forbes v. Wells Beach Casino, Inc.,* 409 A.2d 646, 655 (Me.1979).

[¶ 71] Considering the reasonableness of the gate in light of the nature of the easement, which allows access to a scenic beach that attracts unauthorized visitors, we must weigh Muther and Woods's legal obligation to maintain the gate and their legitimate desire to exclude trespassers from their property against the slight physical impediment created by the gate. *See Ames,* 82 Me. at 382, 19 A. at 856. We conclude as a matter of law that the gate does not unreasonably interfere with the dominant estate's use of the easement.

[¶ 72] With respect to the cameras, although any psychological impediment created by the cameras may be modest given the prevalence of video surveillance in contemporary society, the reasonableness of the cameras cannot be determined without an understanding of the extent to which the nondisturbance clause of the settlement agreement prohibits Muther and Woods from photographing users of the easement. We therefore remand this issue for the trial court to reconsider its decision to prohibit surveillance cameras in the easement in conjunction with Muther and Woods's obligations under the settlement agreement.[13]

### E. J–Lot Owners' Access to the Upland

[¶ 73] The J–Lot owners contend that because the rocks placed at the end of the easement by the Town obstruct their access to the intertidal area of Secret Beach, they must cross over a portion of Holt's upland to access the beach. They argue on cross-appeal that stepping off of the easement onto Holt's upland to access the intertidal zone does not overburden the easement. Accordingly, they contend that Woods should not be permitted to erect a fence along the end of the easement that blocks their access to Holt's upland.

[¶ 74] A court's overburdening analysis "evaluate[s] whether it is reasonable to conclude that a particular use was within the contemplation of the parties to the conveyance and, in that context, whether the contested use made of the servient estate by the dominant estate exceeds the rights granted to the user." *Poire v. Manchester,* 506 A.2d 1160, 1163 (Me.1986). A dominant estate owner may

---

12. Put a different way, the J–Lot owners' claim of interference with the use of an easement is not ripe for adjudication because there is no "concrete, certain, or immediate legal problem." *See Wagner v. Sec'y of State,* 663 A.2d 564, 567 (Me.1995). If Muther and Woods unreasonably interfere with the J–Lot owners' use of the easement or their personal privacy in the future, the remedy of injunctive relief, which the J–Lot owners claimed here, may be available.

13. We note that the trial justice in this case has since retired. On remand the court may, in its exercise of sound discretion, decide this issue based on the existing record or receive additional evidence.

not use an easement to access property that the parties to the conveyance did not originally contemplate would be served by the easement. *See Lakeside,* 2009 ME 64, ¶ 18, 974 A.2d at 898; Hermansen & Richards, *Maine Roads and Easements* § 3.5.2.13 at 26–28 (2d ed. 2003); Restatement (Third) of Prop.: Servitudes § 4.11 cmt. b, illus. 2 (2000). Whether an easement is overburdened is a question of fact. *See Gutcheon v. Becton,* 585 A.2d 818, 822 (Me.1991) (addressing overburdening of a prescriptive easement).

[¶ 75] In this case, the court found that the 1970 plan depicted a twenty-foot-wide right-of-way that extended over Lot J–46 to the mean high water mark of Secret Beach and that Holt's lot was not included as part of the 1970 plan. The court could have reasonably inferred that Alan Balfour did not contemplate that the J–Lot owners would travel outside the twenty-foot-wide walkway to access the intertidal area of Secret Beach or use the easement to access Holt's upland. Furthermore, the 1970 plan provides no support for the notion that the easement was intended to deny Muther and Woods the right to erect a fence along their property line. Thus, the fence is not inconsistent with the J–Lot owners' deeded rights. *See Drummond,* 107 Me. at 407, 78 A. at 472–73.

[¶ 76] The court did not clearly err in determining that the J–Lot owners' use of the easement to access Holt's upland directly overburdened the easement.[14]

**F. Prescriptive Rights to the Upland of Lot J–46**

[¶ 77] The J–Lot owners contend that the evidence at trial supported a finding that they, as a class of persons, used the upland portion of Lot J–46 continuously for a period of twenty years. They argue that the court clearly erred in finding otherwise.

[¶ 78] To establish an easement by prescription, "[t]he party asserting the easement must prove (1) continuous use (2) for at least 20 years (3) under a claim of right adverse to the owner, (4) with his knowledge and acquiescence, or (5) a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed." *Eaton,* 2000 ME 176, ¶ 32, 760 A.2d at 244.

[¶ 79] Although only a subset of the J–Lot owners claimed prescriptive rights in the upland of Lot J–46, the court treated all of the J–Lot owners as a "class of persons" for purposes of the prescriptive easement claim. The court properly focused on evidence of use of the upland portion of Lot J–46 by persons who were J–Lot owners at the time of the use. Viewed in the light most favorable to Muther and Woods, as the prevailing party, *see Batchelder,* 2007 ME 17, ¶ 3, 914 A.2d at 1118, the trial record establishes that only three J–Lot households asserted use of the upland of Lot J–46, and that only one J–Lot owner had used the upland prior to 1999. Reasoning that adverse use by one member of a class of persons was insufficient to establish continuous use by the class, the court concluded that the J–Lot owners, as a class of persons, failed to demonstrate continuous use for twenty years.

[¶ 80] The statute of limitations for adverse possession makes clear that a class of persons may acquire an easement through prescriptive use: "No person, class of persons or the public shall acquire a right-of-way or other easement through,

---

14. As the court noted, if the J–Lot owners have issues with obstructions to their easement rights created by the rocks placed on the easement for drainage purposes by the Town, they should address those issues with the Town, which was not a party to this case.

in, upon or over the land of another by the adverse use and enjoyment thereof, unless it is continued uninterruptedly for 20 years." 14 M.R.S. § 812 (2010).

[¶ 81] We have decided numerous cases regarding acquisition of prescriptive easements by individuals and the public. *See, e.g., Lyons v. Baptist Sch. of Christian Training,* 2002 ME 137, 804 A.2d 364 (discussing public prescriptive easements); *Blackmer v. Williams,* 437 A.2d 858 (Me.1981) (affirming an individual's easement by prescription); *Town of Kennebunkport v. Forrester,* 391 A.2d 831, 833 n. 2 (Me.1978) ("[T]o create a public easement, . . . the adverse use must be general and not limited to a few specific individuals. . . . The test of a public use is not the frequency of the use, or the number using the way, but its use by people who are not separable from the public generally."). However, we have never discussed how a class of persons that is separate from the public can establish the prescriptive element of continuity. There is a similar dearth of cases on this issue in other jurisdictions. *But see Cordrey v. Dorey,* 1996 WL 633293, at *3, 1996 Del. Ch. LEXIS 131, at *7 (1996) (holding that evidence of individual plaintiffs' own personal use of a property was insufficient to support prescriptive easement rights in a class of persons). Additionally, the doctrine of tacking successive prescriptive periods together to establish continuous use does not apply to concurrent users within a class when the members are not in privity of title. *See Glidden v. Belden,* 684 A.2d 1306, 1317 (Me.1996); Restatement (Third) of Prop.: Servitudes § 2.17 cmt. 1 ("The question whether periods of use by successive users can be tacked should not

be confused with the question whether several people can be regarded as concurrent users whose use comprises a single continued use.").

[¶ 82] The question thus presented is whether use by three households—one for twenty years, one for ten years, and one for one year[15]—is sufficient to establish a prescriptive easement for a class of nineteen households.

[¶ 83] In the absence of relevant prior decisions, we seek guidance from the Restatement, which provides: "A servitude should be interpreted to give effect to the intention of the parties ascertained from . . . circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created." Restatement (Third) of Prop.: Servitudes § 4.1(1). When the circumstances surrounding the creation of an easement are prescriptive in nature, "the adverse use that leads to creation of the servitude provides the basis for determining its terms." *Id.* § 4.1 cmt. a.

> Since the servitude created by adverse use arises from the failure of the landowner to take steps to halt the adverse use, interpretation of the prescriptive servitude focuses on the reasonable expectations of the landowner. The relevant inquiry is what a landowner in the position of the owner of the servient estate should reasonably have expected to lose by failing to interrupt the adverse use before the prescriptive period had run.

*Id.* § 4.1 cmt. h. This approach is consistent with the idea that the "open, notorious, [and] visible" element of establishing a prescriptive easement is required "to give notice to the owner of the servient estate

---

15. For purposes of this discussion, we assume that Mary Arnold used the upland of Lot J–46 for twenty years without consideration of whether there was evidence that such prescriptive use was interrupted by nonacquiescence. *See Dowley v. Morency,* 1999 ME 137, ¶ 23, 737 A.2d 1061, 1069.

that the user is asserting an easement." *See Great N. Paper Co. v. Eldredge*, 686 A.2d 1075, 1077 (Me.1996).

[¶ 84] Adopting this view, the objective expectations of the owner of Lot J–46 become central to determining whether, as a matter of law, the conduct by the J–Lot owners established a prescriptive easement for the J–Lot owners, as a class of persons, in the upland of Lot J–46. Those expectations rest on the actual use of the upland during the prescriptive period. In this case, the actual use was quite limited. Only three of nineteen J–Lot households made use of the upland. In addition, only one J–Lot owner used the upland between 1985 and 1999. Viewed objectively, this limited use was insufficient to provide notice to the owner of Lot J–46 that the entire neighborhood was asserting an easement.

[¶ 85] We conclude that the owner of Lot J–46 could not have reasonably expected that acquiescence to such use during the prescriptive period would result in the class of J–Lot owners gaining prescriptive rights to the upland of Lot J–46. Although we rely on a different analysis, we affirm this aspect of the court's judgment.[16] *See Friedman v. Bd. of Envtl. Prot.*, 2008 ME 156, ¶ 1, 956 A.2d 97, 99.

### G. Public Rights in Intertidal Lands

[¶ 86] The State intervened in this case to protect the public's rights in the intertidal lands involved in this matter. Because the court's judgment declaring that the public's right to use the intertidal land in front of Lot J–46 is limited to "fishing, fowling, and navigation" adhered to our decision in *Bell II*, the State urges us to reconsider and overrule our holdings in *Bell v. Town of Wells (Bell I)* and *Bell II. See Bell I*, 510 A.2d 509, 514–15 (Me. 1986) (confirming that the State does not presumptively hold title to intertidal lands); *Bell II*, 557 A.2d at 176. Under the circumstances presented in this case, we do not reach the question.

[¶ 87] "A justiciable controversy is a claim of present and fixed rights, as opposed to hypothetical or future rights, asserted by one party against another who has an interest in contesting the claim." *Connors v. Int'l Harvester Credit Corp.*, 447 A.2d 822, 824 (Me.1982). A decision issued on a non-justiciable controversy is an advisory opinion, which we have no authority to render except on solemn occasions, as provided by the Maine Constitution. *Id.; see* Me. Const. art. VI, § 3.

[¶ 88] Muther and Woods do not hold title to the intertidal land in front of Lot J–46, and the parties did not join the owner of the intertidal land as a party to this action. The parties also stipulated that the J–Lot owners "have the right to use the access way to get to the intertidal zone for uses to which [Muther and Woods] legally cannot object successfully." Although Muther and Woods may still challenge uses of the intertidal land of Secret Beach to the extent that those uses overburden the easement, because we affirm the court's judgment declaring that the J–Lot owners may use the easement to access the intertidal zone for general recreational purposes, a determination of whether the public may use the intertidal

---

16. The court also correctly determined that the J–Lot owners' prescriptive claims to the intertidal land in front of Lot J–46 and the intertidal land and upland of Holt's property were not ripe for adjudication because neither Holt nor the title owner of the intertidal land in front of Lot J–46 were parties to this case. *See Lamson v. Cote*, 2001 ME 109, ¶ 20, 775 A.2d 1134, 1139 (stating that a prescriptive easement claim was "not ripe for adjudication until an owner of the land in dispute is declared").

land for general recreation will not affect the J–Lot owners' permitted use of the easement. As a result, Muther and Woods no longer have "an interest in contesting the [State's] claim." *See Connors*, 447 A.2d at 824. Absent a justiciable controversy, we lack authority to address this issue.[17] *See id.*

## H. Costs

 [¶ 89] In all actions, the prevailing party is entitled to recover costs. 14 M.R.S. § 1501 (2010). To determine which party prevailed, the court applies a "functional analysis" and views "the lawsuit as a whole." *Landis v. Hannaford Bros. Co.*, 2000 ME 111, ¶ 6, 754 A.2d 958, 959 (quotation marks omitted). Because we vacate the court's judgment in part, on remand, the factual determination of which party prevailed in this case may change. As a result, we necessarily vacate the court's award of costs to a group of the J–Lot owners.

[¶ 90] In addition, pursuant to M.R.App. P. 3(b), "[t]he trial court shall take no further action pending disposition of the appeal by the Law Court except: ... in civil cases as provided in M.R. Civ. P. 27(b), 54(b)(3), 60(a), 62(a), 62(c), and 62(d), and in Rule 5(e) of these Rules. . . ." The rule governing costs, M.R. Civ. P. 54(d), is not listed as an exception to Rule 3(b), and the costs addressed by the court in this case did not include attorney fees. *See* M.R. Civ. P. 54(b)(3). Accordingly, after Muther and Woods filed their notice of appeal, the court did not have authority to act on the J–Lot owners' motion for costs. *See Lund v. Lund*, 2007 ME 98,

¶ 20, 927 A.2d 1185, 1192. For these reasons, we vacate the court's award of costs.

The entry is:

Judgment vacated with respect to the declaration that the gate is an unreasonable obstruction to the use of the easement and the requirement that the gate and surveillance cameras be removed. The award of costs is also vacated. Remanded for factual and legal determinations related to the reasonableness of the surveillance cameras and for further proceedings related to the motion for costs. Appeal as to Rule 37(c) award of attorney fees is dismissed as interlocutory. In all other respects, judgment affirmed.

---

17. Because we do not reach the State's claim and because the court's judgment regarding the public's rights in the intertidal land does not affect Muther and Woods, we do not address Muther and Woods's argument that the court erred by deciding this issue without joining the owner of the intertidal land in front of Lot J–46 as a necessary party pursuant to M.R. Civ. P. 19(a).