STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        DOCKET NO. RE-18-92

ROGER P. ASCH                  )
                               )
        Plaintiff,             )
                               )
    v.                         )        ORDER    STATE OF MAINE
                               )                 Cumberland, ss, Clerk's Office
THOMAS P. DOHERTY,             )
                               )                 AUG 17 2020
        Defendant.             )
                                                 RECEIVED

The present action concerns a boundary dispute between Plaintiff/Counterclaim

Defendant Roger P. Asch ("Mr. Asch") and Defendant/Counterclaim Plaintiff Thomas P.

Doherty ("Mr. Doherty").

On September 27, 2019, the court conducted a site-view of the parties' properties

and shared common boundary at issue. On January 14, 2020, the court presided over a

one-day bench trial and heard testimony from Plaintiff and Defendant.

## I.    Findings of Fact

The parties are adjoining landowners. Mr. Asch owns real property located at 80

Brackett Street in Portland, Maine ("80 Brackett" or the "Asch Property"). Mr. Asch and

his former wife, Sara E. Rogers Asch ("Ms. Rogers"), acquired title to 80 Brackett in July

2005 from Robert McArdle and Richard Rothlisberger, who acquired title by deed dated

May 17, 1990.[1] (Jt. Ex. 1–3.)

Mr. Asch shares a common boundary with Mr. Doherty, who resides at 187

Danforth Street ("187 Danforth" or the "Doherty Property"). (Stipulations ¶¶ 1–2.) Mr.

---

[1] Ms. Rogers conveyed her interest in 80 Brackett to Mr. Asch by deed dated July 3, 2007.
(Jt. Ex. 4.)

For Plaintiff: J William Druary, Jr., Esq.          For Defendant: David Sherman, Esq.
and Christopher Pazar, Esq.

Doherty acquired title to 187 Danforth by deed dated June 9, 1999, from Adelaide Curran, who is now deceased. (Jt. Ex. 5.)

The present dispute arose after Mr. Asch replaced an existing wooden fence that separated their yards with a new wooden fence. (*See* Jt. Ex. 6A-1–14 (old fence); Jt. Ex. 6B-1–29 (new fence).) Prior to the dispute, both parties were in agreement that the existing wooden fence separating their properties was in "rough shape" and that it should be replaced. Neither party was aware of the exact location of their deeded property boundary. Mr. Doherty now claims that Mr. Asch moved the new fence closer to his property.

The parties' stipulated that their deeded common boundary line is accurately depicted in an August 17, 2017 survey by R.W. Eaton Associates (hereinafter the "Eaton Survey"). (Jt. Ex. 8; Stipulations ¶¶ 4–5.) Joint Exhibit 8 depicts the strip of land in dispute, which is approximately 79 feet in length and 9.6 inches to 17 inches wide.



(Jt. Ex. 8.)

Having failed to resolve their disagreement, the parties now claim ownership to three distinct areas of land abutting their common boundary (collectively the "Disputed Land"): (1) the strip of land behind Mr. Doherty's garage, in the southeast corner of the Asch Property; (2) the strip of land beneath the fence and between the true boundary line and the new fence; and (3) the strip of land between the true boundary in Mr. Asch's driveway and the foundation of Mr. Doherty's residence. (Tr. 37.)

Mr. Asch commenced this action on March 26, 2018, based on the following causes of action: (Count I) a declaratory judgment confirming that he has fee title to the Disputed Land; (Count II) common law adverse possession; (Count III) statutory adverse possession; (Count IV) prescriptive easement; (Count V) boundary by acquiescence; and (Count VI) a permanent injunction enjoining Mr. Doherty from using the Disputed Land and ordering him to remove a picket fence he installed along the driveway and behind the garage.

Mr. Doherty's counterclaim asserts: (Count I) declaratory judgment confirming that he owns the Disputed Land and that the fence installed by Mr. Asch encroaches upon his property; (Count II) trespass; and (Count III) injunctive relief ordering Mr. Asch to remove the fence, and to cease his trespass and any activities that interfere with the use of his property.

In lieu of live testimony, the court admitted the deposition testimony of Joseph Curran, the son of Adelaide Curran, who resided at 187 Danforth from 1972 until the "early to mid-nineties," and the deposition testimony of Robert McArdle who resided at 80 Brackett from May 1990, until July 2005.

    A. *McArdle Ownership: 1990–2005.*

        *i. Fence Area*

Robert McArdle, Mr. Asch's immediate predecessor-in-title, testified that when he purchased 80 Brackett in 1990, a metal chain link fence existed between the corner of the of the garage and residence. (McArdle Dep. 12.) He believed that the metal fence was owned by Ms. Curran, Mr. Doherty's immediate predecessor-in-title. (McArdle Dep. 25.) In the early 1990's, Mr. McArdle approached Ms. Curran about replacing the metal fence with a new wooden fence. He recalls that, although Ms. Curran did not object to the idea, she did not contribute to the cost of installing a new fence. (McArdle Dep. 26.) When asked whether it was his "understanding that [Ms.] Curran gave you permission to put a new fence in the same location as the old-chain link fence," he replied "Yes." (McArdle Dep. 56.)

Mr. McArdle "didn't really think about boundary lines when [he] replaced it" but believes that the new fence was installed in the same location as the old metal fence. (McArdle Dep. 25.) He believes that the wooden fence posts were approximately five to six square inches – larger than the posts supporting the old metal fence. (McArdle Dep. 57, 59.) He believes that the fence "extended a few inches . . . past the corner of [Ms. Curran's] house and . . . a few inches away from [her] house." (McArdle Dep. 23.) When asked what he understood to be the boundary line, he testified that "my assumption was that there was some number of inches from the Currans' house extending in toward our house that belonged to her, and that would have extended backwards and forward." (McArdle Dep. 13.) He believed that there would have been "enough room on the other side of [the fence] that if you had to maintain the fence, you could do that . . . I don't think

you're supposed to put a fence exactly on the borderline." In practice, however, he treated the fence as the boundary line.[2] (McArdle Dep. 60-61.)

In the early 2000s, Mr. McArdle replaced the fence a second time, again with a new wooden fence. (*See* Jt. Ex. 6A1-14.) He could not recall whether Mr. Doherty or Ms. Curran owned 187 Danforth, and does not recall having any discussion with either about replacing the fence a second time.[3] (McArdle Dep. 27.) Mr. McArdle believes that the second wooden fence would have been installed in a "similar placement" with "three to four inches" between the fence and the corner of the residence. (McArdle Dep. 33-34.)

Mr. McArdle also planted fruit trees along his side of the fence, but could not recall whether they were planted "before or after the first or second fence." (McArdle Dep. 30; Jt. Ex. 6A-7,10.) The fence was used to "train" the trees and provide support. Mr. McArdle also installed a stone wall that runs perpendicular to the fence, he believes in the late 1990's. (McArdle Dep. 31-32; *see* Jt. Ex. 6A-6 (old fence with stone wall); Jt. Ex. 6B-9 (new fence with stone wall).) Mr. Asch testified that when he purchased the property the stone wall came "within a couple of inches" of the old fence. (Tr. 33.)

### i. Garage Area

With regard to the disputed land abutting Mr. Doherty's garage, Mr. McArdle planted and maintained a so-called "strip garden" in the southwest corner of his property, directly up to the foundation of the garage. (McArdle Dep. 16; Jt. Ex. 6A-6.) Although Mr. McArdle does not recall having any discussion with Ms. Curran about the landscaping behind her garage, he does recall obtaining her permission to paint the

---

[2] Joseph Curran, the son of Ms. Curran resided at 187 Danforth between 1972 and the late 1990's. He recalls that that he and his family did not use the area on the 80 Brackett side of the fence, and that his family treated the fence as the boundary line. (Curran Dep. 17.)
[3] Mr. Doherty testified at trial that Mr. McArdle replaced the fence in the early 2000s, after he acquired 187 Danforth. (Tr. 155.)

backside of the garage and install a trellis.[4] (McArdle Dep. 15–17, 21; Jt. Ex. 6A-1, 6, 7.) When asked whether he considered the area behind the garage to be his property, he replied "Yes . . . but realistically I would have anticipated that there was a border of a certain number of inches beyond the property that was not necessarily mine." (McArdle Dep. 16–17.)

### i. Driveway Area

Regarding the disputed land abutting the backside of Mr. Doherty's residence – in what is now Mr. Asch's driveway – Mr. McArdle testified that he installed a driveway in that area during his ownership. Prior to its installation, he recalls that a metal fence extended past the corner of Ms. Curran's home, facing Brackett Street, angling slightly inward toward her home. (See Jt. Ex. 6E-2, 6D-11; McArdle Dep. 36.)

Mr. McArdle testified that he obtained permission from the Public Works Department to get a "curb cut" and a letter from Ms. Curran stating that she had no objections. (Jt. Ex. 10 to Jt. Ex. 12.) He recalls obtaining Ms. Curran's permission to move the fence post that used to extend into the driveway area "eight to ten inches" closer to her home in order to accommodate the width of a car. (McArdle Dep. 40, 54–55.)

When asked whether "Ms. Curran gave [him] permission to construct this parking space in that area" Mr. McArdle replied, "Yes." (McArdle Dep. 54–55.) When asked why he thought he needed to obtain Ms. Curran's permission, he testified that his "assumption was that there was a certain amount of space from her house that was not our property,

---

[4] Mr. Asch testified that the trellis was screwed into the back of the garage at the time he purchased 80 Brackett, similar to another trellis against his residence. After he installed the new fence, someone removed it the trellis and placed it onto his property. Mr. Ash responded by leaning the trellis back up against the garage. (Tr. 82–84.)

and that otherwise the driveway wouldn't have been wide enough to fit a car in." (McArdle Dep. 43.)

B. *Asch Ownership: 2005 – Present*

The location of the wooden fence, driveway, landscaping, trees, garden and trellis remained undisturbed at the time Mr. Asch acquired 80 Brackett in July 2005. (Tr. 31-34.) By 2017, both parties agreed that the second wooden fence, installed by Mr. McArdle, (hereinafter the "old fence") was in need of replacement. (*See* Jt. Ex. 6A-1–14.) Mr. Asch testified that he thought he owned the fencing that bordered all three sides of his property and felt that it was "his fence to replace."[5] (Tr. 34-35.) Sometime in April 2017, he informed Mr. Doherty that he was going to replace the fence, to which Mr. Doherty replied, "Okay, thank you." Both parties were under the impression that it was Mr. Asch's responsibility.

By July 2017, Mr. Asch had hired a general contractor, Andrew Stone. Mr. Stone determined that he could not install a new fence with the same design in the same location due to Mr. Asch's fruit trees. (Stone Dep. 16; *See* Jt. Ex. 6A-1,4,7.) The location of the fruit trees caused the old fence to bow in the middle – leaning slightly into the Doherty Property. (*See* Jt. Ex. 6A-1,7.)

In late July 2017, Mr. Stone and Mr. Asch asked Mr. Doherty if they could move the fence six inches further onto his property to accommodate the fruit trees. Mr. Doherty declined, and told Mr. Asch that he wanted to obtain a survey and determine the true boundary line before moving forward.

---

[5] Mr. Asch replaced all three sides of the fencing that bordered his property. (Tr. 46.) Two of which, share a common boundary with Mr. Doherty's brother and father. (Tr. 25, 46-47.)

Despite Mr. Doherty's concerns, Mr. Asch took the position that a survey was not necessary. Mr. Asch informed Mr. Doherty that "a survey wasn't going to change the concept of adverse possession." (Tr. 54.) In August 2017, Mr. Asch directed Mr. Stone to install the new fence "exactly where it was before," which was installed before Mr. Doherty could obtain a survey. (Tr. 52-59; Jt. Ex. 6B-1–29 (new fence).) Mr. Doherty immediately objected and asked that it be removed.

Mr. Asch maintains that the new fence was installed in the same location as the old fence. (Tr. 56.) The new fence is supported by 2.5 inch metal support posts, which replace the old 6x6 inch wooden posts supporting the old fence. (Stone Dep. 33-34.) This leaves approximately 1 ¾ inches between the fruit trees and metal posts. (Jt. Ex. 6D-5.) The so called "good side" of the fence faces the Doherty Property, with the support posts and cross beams facing the Asch Property. (Jt. Ex. 6B-9, 13.) Mr. Doherty testified that he believes that the new fence encroaches between six and twelve inches onto his property. He testified that the old fence was in a straight line, but that that the new fence bows in the middle, to accommodate the fruit trees.[6] (See Jt. Ex. 6B-15–18; Jt. Ex. 6A-1.)

In December 2017, Mr. Doherty and his brother installed a wooden picket fence in the driveway area and behind his garage based on the results of the Eaton Survey. (Jt. Ex. 6B-23, 6D-6, 7-12.) He also installed 2x4's along sections of the fence, between the fruit trees and fence posts. (Jt. Ex. 6D-5.) Mr. Doherty testified that he installed the picket fence in the driveway area in order to protect his house from car doors opening against his residence. He testified that that neither he nor his bother entered onto Mr. Asch's

---

[6] The old wooden fence wall was located in the middle of the support posts, meaning the cross beams and support posts were visible from both the Doherty Property and the Asch Property. (Tr. 69-70; Stone Dep. 17, 23, 49.)Mr. Doherty maintains that, because the "good side" of the fence faces his backyard, the fence wall was moved closer to his property.

property to install the picket fence in the driveway, but may have "crossed into the air." He also testified that he "cut a hole" in his garage in order to install the fence behind his garage without entering into Mr. Asch's property. Mr. Asch claims that he can no longer open his car door fully due to the location of the picket fence. (Tr. 44; Jt. Ex. 6D-11; Jt. Ex. 6C-4.)

## II. Conclusions of Law

There is no question that the Disputed Land is situated upon property belonging to Defendant. The surveyor's boundary flags accurately demonstrate the Disputed Land is on his side of the true boundary line. (*See* Jt. Ex. 6D-1–15.) Plaintiff therefore seeks to establish title or maintain possession based on the following theories: (1) adverse possession; (2) prescriptive easement; and (3) boundary by acquiescence. The court will address each argument in turn.

### A. *Adverse Possession (Counts II & III)*

As a preliminary matter, Plaintiff asserts two separate counts asserting title by adverse possession: (Count II) common law adverse possession; and (Count III) statutory adverse possession. The Law Court has informed litigants that "[a]lthough we recognize that statements in our opinions may have allowed the inference that there are two separate claims for adverse possession ... there is only one claim – the common law claim as amended by the Legislature."[7] *Dombkowski v. Ferland*, 2006 ME 24, ¶ 19, 893 A.2d 599

---

[7] The Legislature amended Maine's common law adverse possession claim to ensure that "[i]f a person takes possession of land by mistake as to the location of the true boundary line, the possessor's mistaken belief does not defeat a claim of adverse possession." 14 M.R.S. 810-A. Thus, a mistake as to the location of the true boundary line does not preclude a finding of *hostility*

(internal citation omitted). Because a separate statutory claim for adverse possession does not exist, Count III must be dismissed.

With regard to Plaintiff's adverse possession claim under the common law:

A party claiming title by adverse possession has the burden of proving, by a preponderance of the evidence, that possession and use of the property was (1) actual; (2) open; (3) visible; (4) notorious; (5) hostile; (6) under claim of right; (7) continuous; (8) exclusive; and (9) for a duration exceeding the twenty-year limitations period.

*Fissmer v. Smith*, 2019 ME 130, ¶ 41, 214 A.3d 1054 (citation omitted). As a general rule, Maine law disfavors the transfer of land by adverse possession and "there is every presumption that the occupancy is in subordination to the true title." *Hamlin v. Neidner*, 2008 ME 130, ¶ 11, 955 A.2d 251. A "claimant must prove that [his] possession and use satisfied each of the aforementioned elements simultaneously for a period of at least twenty years." *Harvey v. Furrow*, 2014 ME 149, ¶ 17, 107 A.3d 604 (citation omitted).

In this case, Plaintiff demonstrated that he and his immediate predecessor-in-title used the Disputed Land in a manner sufficient to establish the elements of actual, open, visible, notorious, continuous, and exclusive, for more than twenty years.[8] Indeed, Mr. McArdle's testimony evidences that he utilized and maintained this land openly, and exclusively as his own. Plaintiff, in turn, continued to occupy and maintain that area with the same understanding that it "belonged" to 80 Brackett and that Defendant's house, the foundation of the garage and the fence formed the boundary. (Tr. 35.)

Nonetheless, Plaintiff's claim fails on the elements of hostility and under claim of right. "Under a claim of right means that the claimant is in possession as owner, with the intent to claim the land as its own, and not in recognition of or subordination to the record title owner." *Harvey*, 2014 ME 149, ¶ 15, 107 A.3d 604. Although Mr. McArdle used the

---

[8] *See Harvey*, 2014 ME 149, ¶¶ 12-13, 107 A.3d 604.

Disputed Land as if it were his own, he did not do so because he believed he "did in fact own it." *Id.* ¶ 16. He did so in recognition of Ms. Curran's and Mr. Doherty's status as record title owners.[9]

With regard to the driveway area, Plaintiff also failed to establish the element of hostility. "Hostile simply means that the possessor does not have the true owner's permission to be on the land." *Id.* ¶ 14 (citation omitted). "Permission negates the element of hostility, and precludes the acquisition of title by adverse possession." *Dombkowski,* 2006 ME 24, ¶ 12, 893 A.2d 599. In this case, Mr. McArdle obtained Ms. Curran's permission to construct a driveway and move a fence post closer to her residence to accommodate a driveway directly up to the foundation of her residence.

Simply put, Plaintiff's claim could not begin to accrue until after he acquired 80 Brackett in July 2005. Plaintiff therefore failed to prove by a preponderance of the evidence that he acquired title by adverse possession to the Disputed Land.

B. *Prescriptive Easement (Count IV)*

For similar reasons, Plaintiff failed to meet his burden establishing that he acquired a private easement by prescription. A party claiming a prescriptive easement must prove, by a preponderance of the evidence:

> (1) continuous use for at least twenty years; (2) under a claim of right adverse to the owner; (3) with the owner's knowledge and acquiescence, or with a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed.

---

[9] As previously discussed, Mr. McArdle believed that the owners of 187 Danforth owned a "few inches" beyond the foundation of their garage, residence, and the fence. (McArdle Dep. 10, 13, 60-61.) With regards to applicability of 14 M.R.S. § 810-A, while Plaintiff may have possessed the Disputed Land based on a mistaken belief as to the true boundary line, the requisite time period is not satisfied because Mr. McArdle did not possess the land under the same mistaken belief – despite using it as his own.

*Lincoln v. Burbank*, 2016 ME 138, ¶ 27, 147 A.3d 1165. "Acquiescence by the owner to the use is essential, and, in this regard, the acquisition of an easement by prescription differs from the acquisition of title by adverse possession." *Shadan v. Town of Skowhegan*, 1997 ME 187, ¶ 6, 700 A.2d 245. "Acquiescence" is considered "consent by silence." *Stickney v. City of Saco*, 2001 ME 69, ¶ 23, 770 A.2d 592. It "implies passive assent or submission to the use, as distinguished from the granting of a license or permission given with the intention that the licensee's use may continue only as long as the owner continues to consent to it." *Id.* (internal quotation marks omitted) (citation omitted).

With regard to the second element, adversity is established by evidence that the claimant used the property "(1) in the absence of the owner's express or implied permission, and (2) as the owner would use it, disregarding the owner's claims entirely, using it as though the claimant owns the property himself (3) such that the use provided the owner with adequate notice that the owner's property rights are in jeopardy." *Cedar Beach/Cedar Island Supporters, Inc. v. Gables Real Estate LLC*, 2016 ME 114, ¶ 13, 145 A.3d 1024 (citation omitted).

With these facts, the court finds that Plaintiff adequately demonstrated that he and his predecessor-in-title's possession and use was accompanied by the true owner's knowledge and acquiescence, for at least twenty years. Having satisfied the first and third elements, the burden then shifts to Defendant to rebut the presumption that "the use of the property was under a claim of right adverse to the owner . . . ."[10] *See Riffle v. Smith*, 2014 ME 21, ¶¶ 6, 8, 86 A.3d 1165 (citation omitted) (noting, however, that the

---

[10] It's unclear whether the opposing party has the burden of rebutting the presumption that the claimant's use was "under a claim of right," in addition to the element of adversity. The distinction, however, has no impact on the court's decision.

presumption will not arise "[i]f there is an explanation of the use that contradicts the rationale of the presumption . . . .").

As previously discussed, Plaintiff's use was not "under a claim of right" for at least twenty years. Mr. McArdle used the Disputed Land in recognition of the true owner's title. *Harvey*, 2014 ME 149, ¶ 15, 107 A.3d 604. Plaintiff's right to claim a prescriptive easement could not begin to accrue until after he acquired title to 80 Brackett.

Accordingly, Plaintiff failed to establish that he has acquired a prescriptive easement to the Disputed Land.

### C. *Boundary by Acquiescence*

In order to establish a boundary line by acquiescence, a claimant must prove the following four elements by clear and convincing evidence:

1) possession up to a visible line marked clearly by monuments, fences or the like;
2) actual or constructive notice to the adjoining landowner of the possession;
3) conduct by the adjoining landowner from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred; [and]
4) acquiescence for a long period of years such that the policy behind the doctrine of acquiescence is well served by recognizing the boundary.

*Dowley v. Morency*, 1999 ME 137, ¶ 16, 737 A.2d 1061. "Clear and convincing" evidence is "evidence that provides the fact-finder with an abiding conviction that the truth of the proponent's contentions is highly probable." *Grondin v. Hanscom*, 2014 ME 148, ¶ 11, 106 A.3d 1150. A boundary by acquiescence "may be proven even where the deed description is clear and the legal boundary is known." *Dowley*, 1999 ME 137, ¶ 16, 737 A.2d 1061.

Regarding the first element, there is no question that Plaintiff and his predecessor-in-title used the land up to a visible line as marked by the garage, fence, and foundation of Mr. Doherty's residence. Second, Plaintiff presented sufficient evidence

demonstrating that the true owners had actual notice of the possession up to the claimed boundary line.

With regard to the third element, Plaintiff adequately proved "conduct by the adjoining landowner from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred." Indeed, there is no evidence that the true owner's conduct and acquiescence was the result of a mistake. *See Davis v. Mitchell*, 628 A.2d 657, 660-61 (Me. 1993). Prior to the present dispute, Mr. Doherty never asked Mr. Asch to remove the landscaping behind his garage, the fruit trees, or the fence itself. (Tr. 107-08.) He never gave Mr. Asch permission to access or use the strip of land in dispute, nor did Mr. Asch ever request it. When asked whether he used the land on the Asch side of the fence, he stated "I did not." (Tr. 97.) He testified that both he and Mr. Asch cared for the land on their sides of the fence and garage.

Despite Plaintiff's best efforts and instructions, there is also no question that the new fence moved further onto Defendant's property. For instance, Joint Exhibits 6A-2 and 6A-3 evidence that an approximately four inch gap existed between the old fence wall and the corner of Mr. Doherty's residence. The new fence leaves no gap. (*See* Jt. Ex. 6B-11–12.) Moreover, there is no question that the new fence was installed closer to Mr. Doherty's property to accommodate the fruit trees. (Jt. Ex. 6B-13.)

Given the long period of time in which Defendant and his predecessor-in-title acquiesced to the boundary line established by the old fence wall, the court concludes that the policy behind the doctrine of acquiescence is well served by recognizing the boundary established by the old fence wall. Recognizing the claimed boundary abutting the foundation of Mr. Doherty's garage, which has also been maintained exclusively as property belonging to 80 Brackett for a substantial period of time, also serves the policy.

With regard to the driveway area, Defendant and his predecessor-in-title recognized and acquiesced to Plaintiff and his predecessor-in-title's use of the full width of the driveway for a long period of time. Recognizing a boundary that permits Plaintiff to use the full width of the driveway also serves the policy behind the doctrine of establishing a boundary by acquiescence.

The court hereby orders Plaintiff to remove the new fence he installed in 2017 and place it at the boundary line established by the old fence wall and post holes.[11] The boundary established in this order is consistent with the old fence wall, as it sat in the middle of the old support posts and 6X6 fence post holes. The boundary line extends as if the old fence wall extended the full length of parties' shared boundary, leaving approximately four inches abutting the garage and foundation of Defendant's residence.

The court further orders Defendant to remove the picket fence he installed in Mr. Asch's driveway, the 2X4's, and picket fence installed behind the garage to reflect the newly established boundary.

### D. *Trespass*

Regardless of the *de minimis* nature of the encroachment, Mr. Asch's actions, moving the fence further onto Defendant's property, constitutes a trespass upon his property. Indeed, it was Mr. Asch who decided to install the new fence in the face of Mr.

---

[11] The court is not persuaded by Plaintiff's argument that, as a result of Defendant and his predecessor-in-title's actions, Defendant should be estopped from forcing the removal of the fence, or prohibiting Plaintiff from using the full width of his driveway. (Pl.'s Br. 17.) The doctrine of equitable estoppel "precludes an owner from asserting his legal title when, by his own action or inaction, he has caused another person to act or to alter [his] position to [his] detriment." *Longley v. Knapp*, 1998 ME 142, ¶ 12, 713 A.2d 939. In the instant case, Defendant was merely a neighbor who, until recently, had no reason to speak up and has done nothing to influence Plaintiff's behavior. *See Id.* ¶ 13.

Doherty's objections. In the absence of any actual damage or loss of use, the court finds that Defendant is entitled to nominal damages in the amount of one dollar.

## III. Conclusion

For the foregoing reasons, the court cannot enter a declaratory judgment in favor of either parties' claims for a declaratory judgment, as they both seek a declaration based on the results of the Eaton Survey. The court finds in favor of Defendant on Counts II and IV. The court further finds that Plaintiff established a boundary line by acquiescence (Count V) consistent with the location of the old fence wall as it existed in the old fence posts.

With regard to Defendant's trespass claim (Count II), the court finds in favor of Defendant and awards nominal damages in the amount of one dollar. With regard to Plaintiff's claim for a permanent injunction (Count VI) and Defendant's claim requesting injunctive relief (Count III), the court hereby orders Plaintiff to remove the new fence and place it back to the boundary line established by this court's order, and further orders that Defendant remove the picket fence installed in Plaintiff's driveway and behind his garage consistent with the established boundary line.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: _8/17/2020_

MaryGay Kennedy, Justice
Maine Superior Court

Entered on the Docket: 8/19/2020